**F. W. MYERS & CO., INC., and
A. H. Bottorff Co.**

v.

**UNITED STATES.**

C.D. 4544;   Court  Nos.  R67/16567–3850,
etc., R67/10201–3795, etc.

United States Customs Court.
May 28, 1974.

862

Barnes, Richardson & Colburn, New York City, Joseph Schwartz and Irving Levine, New York City, of counsel, for plaintiffs.

Carla A. Hills, Asst. Atty. Gen., Velta A. Melnbrencis, New York City, trial atty., for defendant.

James R. Sharp, Washington, D. C., amicus curiae.

MALETZ, Judge:

These actions, which were tried jointly, involve the assessment under the Antidumping Act of 1921, as amended (19 U.S.C. § 160 et seq.) of special dumping duties against various styles of hand-operated steel jacks that were manufactured and sold by J. C. Hallman Manufacturing Co., Limited of Kitchener, Ontario, Canada (Hallman) and purchased by A. H. Bottorff Co., Inc. of St. Joseph, Missouri (Bottorff).[1] The jacks were exported from Canada during the period from December 27, 1964 through June 8, 1966 and entered at the port of Detroit.

I

Helpful in understanding the issues in this case is a brief summary of the Antidumping Act and its administration.[2] In essence, that act provides that if a foreign exporter sells merchandise to the United States at a price less than its "fair value," i. e., the price charged by the exporter in his home market[3]—with resultant injury to a U. S. industry—a special dumping duty will be assessed upon the importation of the merchandise. If the exporter and importer are not related, this duty is measured by the difference between the higher "foreign market value" and the lower price charged the U. S. importer.

The question as to whether merchandise is being sold at less than fair value is determined by the Secretary of the Treasury. If the Secretary makes an affirmative finding in this regard, the question as to whether there is injury is determined by the Tariff Commission. If the Commission makes a determination of injury, the Secretary makes and publishes a finding of dumping. Once the finding of dumping has been published, customs officers proceed to assess

1. At a pretrial conference, plaintiffs abandoned their claims as to so-called "wheel-it" jacks which were covered by Court No. R67/16568 in the *Myers* action and Court No. R67/10202 in the *Bottorff* action. · The remaining "wheel-it" jacks—which were covered by R67/10212 in the *Bottorff* action— were not referred to by plaintiffs in their pleadings, at the trial or in their brief and their claim as to this item is therefore deemed abandoned. See e. g., Nurserymen's Exchange v. United States, 41 Cust.Ct. 223, C.D. 2044 (1958).

2. In setting out this summary, I have borrowed heavily from summaries of the act and its administration which were prepared for the Senate Committee on Finance by the Executive Branch and by a Special Assistant to the Secretary of the Treasury. See Vol. 1 Compendium of Papers on Legislative Oversight—Review of U. S. Trade Policies, Committee on Finance, United States Senate, Committee Print (90th Cong., 2d Sess., 1968) pp. 73 et seq., and pp. 156 et seq.

3. "Fair value" is not defined in the law but, as later discussed, is defined in the customs regulations.

and collect dumping duties which (as noted before) are equal, if the exporter and importer are not related, to the amount by which the American importer's purchase price is less than the foreign market value. In assessing such duties, in the event sales in the home market are made under circumstances which differ from those incurred in sales to the United States, adjustments must be made by the customs officers for differences in quantities and other circumstances of sale in order to place the sales on a basis as nearly equivalent as practicable.

With respect to administration of the act, antidumping investigations are usually triggered by the complaint of an affected domestic industry filed with the Commissioner of Customs. Upon receipt of such a complaint with supporting information, the Commissioner conducts a summary investigation to determine whether grounds exist for further consideration of the case. If he concludes that such grounds do exist, he publishes an "Antidumping Proceeding Notice" briefly describing what is at issue and conducts a preliminary investigation based on the examination of invoices and other information immediately available to him. Should the Commissioner determine from this preliminary investigation that reasonable grounds exist to believe or suspect that sales at less than fair value are taking place, he orders the withholding of appraisement of shipments of the merchandise being imported into the United States and publishes a "Withholding of Appraisement Notice." This action insures that in the event a dumping finding is made, the government will be able to collect any antidumping duties which may be due on these shipments.

After publishing the "Withholding of Appraisement Notice," the Commissioner conducts a full-scale investigation upon completion of which he makes a report of his findings to the Secretary of the Treasury. When the Secretary reaches his conclusion in the matter, he publishes a "Notice of Tentative Determination" which includes a statement of reasons for his action. Interested parties are thereupon given an opportunity to submit argument or appear in person in support of or in opposition to the tentative determination.

After examination of the arguments and evidence submitted in response to the tentative determination, the Secretary publishes a final determination. If the final determination is that sales at less than fair value are taking place, the case is referred to the Tariff Commission for a determination as to whether a U. S. industry has been injured. In turn, if the Commission, after such investigation as it deems necessary, makes a determination of injury, it so notifies the Secretary of the Treasury. The Secretary thereupon publishes a finding of dumping, and customs officers then assess antidumping duties on any shipment where, if the exporter and importer are not related, the U. S. purchase price is less than the foreign market value. As previously mentioned, in assessing such duties, if sales in the home market are made under circumstances which differ from those incurred in sales to the United States, adjustments in the duty amount are required to be made for differences in quantities and circumstances of sale.

## II

Pertinent to the proceedings which led to the imposition of the dumping duties here in issue is section 201 of the Antidumping Act of 1921, as amended (19 U. S.C. § 160),[4] which provides in relevant part:

(a) Whenever the Secretary of the Treasury (hereinafter called the "Secretary") determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States or elsewhere at less than its fair value, he shall so advise the United States Tariff Commission, and the

---

4. All U.S.C. references here and hereafter are to the 1964 edition.

said Commission shall determine within three months thereafter whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States. The said Commission, after such investigation as it deems necessary, shall notify the Secretary of its determination, and, if that determination is in the affirmative, the Secretary shall make public a notice (hereinafter in sections 160–173 of this title called a "finding") of his determination and the determination of the said Commission. * * *

(b) Whenever, in the case of any imported merchandise of a class or kind as to which the Secretary has not so made public a finding, the Secretary has reason to believe or suspect, from the invoice or other papers or from information presented to him or to any person to whom authority under this section has been delegated, that the purchase price is less * * * or likely to be less, than the foreign market value (or, in the absence of such value, than the constructed value), he shall forthwith publish notice of that fact in the Federal Register and shall authorize, under such regulations as he may prescribe, the withholding of appraisement reports as to such merchandise entered, or withdrawn from warehouse, for consumption, not more than one hundred and twenty days before the question of dumping has been raised by or presented to him or any person to whom authority under this section has been delegated, until the further order of the Secretary, or until the Secretary has made public a

finding as provided for in subdivision (a) in regard to such merchandise.

(c) The Secretary, upon determining whether foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and the United States Tariff Commission, upon making its determination under subsection (a) of this section, shall each publish such determination in the Federal Register, with a statement of the reasons therefor, whether such determination is in the affirmative or in the negative.

Pursuant to these statutory provisions, the following administrative actions—which culminated in the present controversy—took place:

On April 23, 1965, the Acting Commissioner of Customs issued an "Antidumping Proceeding Notice"—which was published in the Federal Register on April 30, 1965 (30 F.R. 6123)—stating that the Commissioner of Customs had received information that steel jacks imported from Canada, manufactured by Hallman, were being, or likely to be, sold at less than fair value, and that the Bureau of Customs was instituting an inquiry into the matter.

On May 3, 1965, the Acting Commissioner of Customs issued a "Withholding of Appraisement Notice" which was published May 8, 1965 (30 F.R. 6445). The notice stated that there were reasonable grounds to believe or suspect that the "purchase price" or "exporter's sales price" was less or likely to be less than the "foreign market value" of the steel jacks imported from Canada manufactured by Hallman and that the appropriate basis of comparison with "foreign market value" would be published in a supplemental notice in the Federal Register as soon as possible.[5] The notice

5. If the importer and exporter are dealing at arms' length, the "purchase price," as defined in section 203 of the Antidumping Act (19 U.S.C. § 162), i. e., the price paid by the importer to the exporter, with certain specified adjustments, is utilized as the basis for comparison with foreign market value. If, however, the exporter and importer are related, then the "exporter's sales price" as defined in section 204 (19 U.S.C. § 163) is utilized. The "exporter's sales price" is the price, with specified adjustments, at which the importer resells to unrelated purchasers. See Secretary of Treasury's report of February 1, 1957 on antidumping which is contained in hearings before the House Ways

also indicated that customs officers were being directed to withhold appraisement of such steel jacks imported from Canada. In accordance with this directive, the district director at Detroit withheld appraisement of the steel jacks here in issue.

On September 2, 1965, a supplementary "Withholding of Appraisement Notice" was issued by the Commissioner of Customs and published on September 9, 1965 (30 F.R. 11532). This notice referred to the notice published on May 8, 1965—when the then available information was insufficient to determine the appropriate basis of comparison with foreign market value—and stated that the information "now available" disclosed that "purchase price" was the appropriate basis of comparison for fair value purposes.

On December 29, 1965, the Acting Assistant Secretary of the Treasury made a tentative determination, published January 5, 1966 (31 F.R. 100), that the Hallman steel jacks "are being, or are likely to be" sold at less than fair value within the meaning of section 201(a) of the Antidumping Act (19 U.S.C. § 160(a)). He stated, as the reasons therefor, that the purchase price was compared with the home market price for fair value purposes and that it was less than the adjusted home market price for each size jack considered.

On May 17, 1966, the Assistant Secretary of the Treasury issued a "Determination of Sales at Less Than Fair Value," published May 24, 1966 (31 F.R. 7485), stating that he had determined, for the reasons set forth in the tentative determination, that steel jacks imported from Canada, manufactured by Hallman, were being, or were likely to be, sold at less than fair value within the meaning of section 201(a) (19 U.S.C. § 160(a)).

Upon being informed of the Assistant Secretary's determination, the Tariff Commission published a "Notice of Investigation" on May 25, 1966 (31 F.R. 7534), advising that it had instituted an investigation under section 201(a) to determine whether an industry in the United States was being, or was likely to be injured, or prevented from being established by reason of the importation of such merchandise into the United States. On June 10, 1966, the Commission issued a notice that a public hearing would be held on July 6, 1966 (31 F.R. 8185).

Thereafter, in an opinion published on August 24, 1966 (31 F.R. 11197) the Tariff Commission (with two Commissioners dissenting) determined that an industry in the United States was likely to be injured by reason of the importation of the Hallman steel jacks from Canada, sold at less than fair value. In accordance with section 201(a) of the act (19 U.S.C. § 160(a)), the Assistant Secretary of the Treasury issued a finding of dumping on September 1, 1966 with respect to such jacks, which was published on September 13, 1966 as T.D. 66–191 (31 F.R. 11974).

Upon publication of the dumping finding, the jacks were appraised by the Detroit district director with respect to their foreign market value and purchase price, as required by section 209 of the Antidumping Act (19 U.S.C. § 168) [6] in order to determine the amount of special dumping duty that was to be levied, i.

and Means Committee on H.R. 6006, 6007 and 5120, Amendments to the Antidumping Act of 1921, as Amended (85th Cong., 1st Sess., 1957) pp. 13–14, 21–22.

6. Section 209 (19 U.S.C. § 168) provides as follows:

In the case of all imported merchandise, whether dutiable, or free of duty, of a class or kind as to which the Secretary of the Treasury has made public a finding as provided in section 160 of this title, and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, it shall be the duty of each appraiser or person acting as appraiser, by all reasonable ways and means to ascertain, estimate, and appraise (any invoice or affidavit thereto or statement of constructed value to the contrary notwithstanding) and report to the collector the foreign market value or the constructed value, as the case may be, the purchase price, * * *.

e., an amount equal to the difference between the two figures. Section 202(a) (19 U.S.C. § 161(a)).[7]

The purchase prices, which were ascertained by the district director pursuant to section 203 (19 U.S.C. § 162), are not in issue. Rather, plaintiffs' primary challenge is to the director's determination of the foreign market value under sections 205 and 202(b) of the Antidumping Act (19 U.S.C. §§ 164 and 161(b)).

In this connection, section 205 (19 U.S.C. § 164) defines foreign market value as—

* * * the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, or if the Secretary determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which so sold or offered for sale for exportation to countries other than the United States), plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, * * *.

This statutory definition of foreign market value is modified in part by section 202(b) (19 U.S.C. § 161(b)) which provides that—

(b) In determining the foreign market value for the purposes of subsection (a) of this section, if it is established to the satisfaction of the Secretary or his delegate that the amount of any difference between the purchase price and the foreign market value (or that the fact that the purchase price is the same as the foreign market value) is wholly or partly due to—

(1) the fact that the wholesale quantities, in which such or similar merchandise is sold or, in the absence of sales, offered for sale for exportation to the United States in the ordinary course of trade, are less or are greater than the wholesale quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States),

(2) other differences in circumstances of sale, * * *

* * * * * *

then due allowance shall be made therefor.

In applying the foregoing formula, the district director computed the foreign market values for the jacks on the basis of the Canadian list price including 11% sales tax, less 47% quantity discount,

---

7. Section 202(a) (19 U.S.C. § 161(a)) provides in relevant part: ·
   (a) In the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary of the Treasury has made public a finding as provided for in section 160 of this title, entered, or withdrawn from warehouse, for consumption, not more than one hundred and twenty days before the question of dumping was raised by or presented to the Secretary or any person to whom authority under said section has been delegated, and as to which no appraisement report has been made before such finding has been so made public, if the purchase price * * * is less than the foreign market value * * * there shall be levied, collected, and paid, in addition to any other duties imposed thereon by law, a special dumping duty in an amount equal to such difference. ·

less a 1% cash discount, less an advertising and printing allowance of $0.08 Canadian dollars and then converted the result to U. S. dollars using the quarterly rate of exchange in effect at the time of exportation.

Plaintiffs contend, however, that the foreign market values thus found by the district director are incorrect because he did not make an allowance, or made insufficient allowance, under section 202(b)(1) and (2) (19 U.S.C. § 161(b)(1) and (2)) for "the difference between the Canadian home consumption price and the export price to the United States due to the difference in the wholesale quantities in which the merchandise was sold in the respective markets, and due to other differences in circumstances of sale" (br. p. 2).

If these allowances were made, plaintiffs allege, they would either lower the foreign market values to the same level as the purchase prices, thereby eliminating the dumping duties entirely, or at least reduce the foreign market values substantially so that the dumping margin (and the duties) would be reduced proportionately.

Plaintiffs also claim that under the customs regulations then in effect, the district director could not legally withhold appraisements of steel jacks entered prior to publication on September 9, 1965 of the supplementary "Withholding of Appraisement Notice," and that appraisement for dumping purposes of entries made prior to that date are invalid.

Finally, plaintiffs urge that the determination of the Assistant Secretary of the Treasury of sales at less than fair value is erroneous.

### III

Turning now to the record, plaintiffs called three witnesses: Jacob C. Hallman, president since 1938 of Hallman; Kenneth H. Bottorff, owner of Bottorff; and Charles H. Spry, a Canadian chartered accountant and partner in a Canadian accounting firm. Defendant offered the testimony of John Kokos, a certified public accountant and partner in an Indiana public accounting firm.

The witness Hallman, who directs the operations of the company "in all regards," testified that during the period in question, his company manufactured three separate product lines—steel jacks, electric fencing and accessories, and pipe organs—but had no separate divisions and kept no separate books or records for each product; that 50 to 60 percent of its total sales of steel jacks were to Canadian customers, mostly jobbers, who got varying discounts off the price list depending upon the quantity purchased, which rarely exceeded 300 jacks per order; that about 40 percent of its jack sales were to Bottorff, its exclusive purchaser in the United States, which imported the merchandise for resale to wholesalers and jobbers; that Bottorff purchased in railway carload lots averaging about 2,700 to 3,000 jacks per load and in truck lots averaging about 1,200 to 1,300 jacks per load; and that many more individual sales were made to Hallman's Canadian customers, because of the smaller quantities involved, than to Bottorff. The witness stated that it was probable that in 1965 and 1966 Hallman sold jacks to countries other than Canada and the United States but indicated that such sales amounted to "less than 10 percent."

Hallman also testified that the following expenses were incurred in his Canadian sales but not in his sales to Bottorff: Sales salaries and commissions, service and demonstration, advertising, truck expense and depreciation, auto expense and depreciation, and donations. He added that the following expenses were greater in the Canadian market than in the United States market: Warehousing of finished goods, traveling expenses, general selling expenses, interest and exchange, discounts allowed, management and office salaries, office expenses, telephone expenses, postage,

depreciation of office furniture and general expenses.[8]

During the period in question, the witness Hallman concentrated on selling jacks while three of his four salesmen sold organs, and the fourth sold jacks and organs. Although records were not kept of the expenses incurred for each product, management and office personnel kept time sheets showing how much time was spent on each activity. The salesmen, however, did not keep records to the same extent.

At Hallman's request, its accountant, Spry,[9] prepared in October 1971 an analysis (exhibit 2)[10] comparing the "pricing policies and circumstances of sale relating to the prices charged to Canadian customers" with the prices charged to Bottorff in the United States for the sale of jacks during the period from January 1, 1965 to June 30, 1966. Through a series of calculations, described below, Spry allocated various overhead expenses, which he considered to be costs incurred "in connection with jack sales," between the Canadian and United States markets, and arrived at an overhead cost of $1.07 per unit for sales to Canadian customers and 14 cents per unit for sales to Bottorff. Plaintiffs claim that the resulting 93 cent differential should have been allowed as "other differences in circumstances of sale" under section 202(b)(2) of the Antidumping Act (19 U.S.C. § 161(b)(2)) in computing foreign market value. Although this allowance of 93 cents would, according to plaintiffs' own calculations, still leave a differential ranging from one to 29 cents between the prices to the Canadian customers and to Bottorff, plaintiffs contend that this differential is justified under section 202(b)(1) (19 U.S.C. § 161(b)(1)) because of the differences in the wholesale quantities sold in the Canadian and United States markets.

Considering exhibit 2 in greater detail, the first tabulation therein lists the number of jacks sold per month to "Canadian Customers" and to Bottorff from January 1, 1965 through June 30, 1966. These figures were based on invoice data obtained from Hallman's clerks which were tested for accuracy by random checking by Spry's staff. Spry stated (R. 104) that the results "were very reliable" and "we were able to reconcile the total value determined with the records of the company, by that I mean total sales."[11]

Exhibit 2 also lists, by size, the total number of jacks sold to Canadian customers and to Bottorff during the period in question, and states that there were 1,399 invoices to Canadian customers averaging 43 jacks per invoice, that only 153 of these sales were for more than 100 jacks, and that the largest Canadian sale was for 400 jacks. During the same period, according to Spry, there were only some 35 invoices made out to Bottorff, averaging 1,475 jacks per invoice.

The various selling, delivery, financial and administrative expenses incurred by Hallman for all of its manufacturing op-

8. Bottorff testified that his company incurred the following expenses in connection with the resale of the Hallman jacks in the United States: Salaries and commissions, service and demonstration, advertising, truck expense and depreciation, automobile expense and depreciation, general selling expense, interest expense, office furniture depreciation, miscellaneous expenses and some donations; and that he ordered in large quantities, usually by the truck load, in order to get the most favorable transportation rates.

9. Spry, whose firm has been auditor for Hallman since 1955, has personally been in charge of preparing the latter's financial statements since 1958.

10. Exhibit 2 was received in evidence with the exception of the concluding paragraph.

11. How Spry was able to reconcile these invoices with the total sales is unclear, in view of the fact that Hallman also sold jacks to third countries during this period. See, for example, exhibit 3, comprising all Hallman's sales invoices for June, 1965, which included an invoice for a sale of 500 jacks (equal to approximately one-quarter of jack sales to Canadian customers that month) to a company in England.

erations for 1965 are also shown in exhibit 2 in tabular form.[12]

This table includes, in addition, a percentage of each of the foregoing expenses that was believed to be "attributable to jacks." However, as previously noted, the actual costs incurred by the jack division could not be ascertained inasmuch as Hallman did not keep separate records of the expenses incurred by each of its product lines.[13] Therefore, Spry explained, in lieu of actual cost figures he utilized the percentage figures for the 1964 calendar year that were set forth in a "statement of income" for management use only", which statement was prepared by his firm for Hallman in order to enable the latter to determine whether or not to discontinue the manufacture of organs. More particularly, this statement contained a schedule allocating a percentage of each category of "commercial" or overhead expenses to each of Hallman's three product lines. These percentage allocations were not recorded in the books or taken from company records, but were based solely on management estimates which were never checked for reliability or verified independently by Spry's firm.

In turn, Spry used these estimated 1964 percentage allocations in preparing the analysis of 1965 overhead expenses because "they were the only figures available to us" (R. 109). He did not question their accuracy on the stated ground (R. 110) that—

* * * they were given to us by management and with our knowledge of the business they were reasonable allocations. We had no reason to suggest that they should not be used because they were unreasonable.

In this connection, he added that the allocations were within "the zone of reasonableness" (R. 110).[14]

The next tabulation shown in exhibit 2 allocates the estimated 1965 overhead expenses for jacks between Canadian customers and Bottorff "on the most reasonable basis in each case." The first item listed, namely, "Finished goods warehousing," was determined on the basis of the space allocated for storing finished jacks, while the other expense allocations [15] were based on "management representation to us which appeared reasonable to us" (R. 112).[16]

12. The expenses thus shown are: Sales salaries and commissions, traveling expenses, service and demonstration, advertising, truck expenses, truck depreciation, general selling expenses, interest and exchange, discounts allowed, management and office salaries, office expenses, telephone, postage, automobile expenses, donations, automobile depreciation, office furniture depreciation and general expenses.

13. Hallman only kept records of the total overhead costs of its entire manufacturing output. Thus, the annual certified statements of 1964, 1965 and 1966 (exhibits A; 5; and B), which Spry prepared for Hallman's shareholders, list the "Commercial" expenses incurred for all of its business activities under three categories: "Selling" (sales salaries and commissions, traveling, service installation and demonstrations, advertising, truck expense, truck depreciation and general selling expenses); "Financial" (interest and exchange, discounts allowed and allowance for doubtful amounts); and "General and administrative" (management and office salaries, office expenses, tele-

phone, postage, automobile expenses and depreciation, donations, depreciation of office furniture and equipment and general expenses).

14. The "zone" was apparently quite elastic inasmuch as Spry testified that he would have, for example, accepted an estimate of 40 percent instead of the 30 percent allocated to the jack division in 1964 for "management and office salaries"; indeed. he testified that he would also have accepted a figure that was under 30 percent.

15. See note 12 for the list of itemized expenses.

16. Spry described the procedure used to allocate expenses between the two markets thusly (R. 113–4):

For example, we would have the problem of allocating travel expense, $1,993. My question to Mr. Hallman probably would go something like this: "To what extent was traveling involved with your business with Mr. Bottorff? Did you go over to the . States? What travel would you do?" And then in response to his an-

This "reasonable" method resulted in the following: Of the total estimated jack overhead expenses of $42,683 for 1965, $4,335—or just over 10% of this total—was allocated to the expenses attributable to the export sales to the United States in 1965 of 30,699 units, while the balance—$38,348—was allocated to the expenses attributable to the sales in Canada in 1965 of 35,804 units.

Dividing the expenses thus allocated to the Canadian and United States markets by the number of units sold in each, Spry arrived at the aforementioned "cost per unit" of $1.07 for sales in Canada and of 14 cents for sales in the United States to Bottorff, resulting in an "additional cost per Canadian unit" of 93 cents (exhibit 2, p. 3).

The next series of calculations contained in exhibit 2 work toward an adjusted sales price, that is, a lower foreign market value for each size jack which was sold to Canadian customers during the period from January 1, 1965 to June 30, 1966. This was done by deducting from the list price (exhibit 1) the 47% quantity discount allowed on sales of 100 or more units, the 11% Canadian sales tax and the 93 cent differential in the overhead expenses. for 1965, and then converting the result to United States currency for each of the four sizes of jacks involved.[17] The adjusted figures were worked out separately for each quarter in 1965 and the first two quarters in 1966 (because official currency conversion rates varied in each quarter) and were then compared with the sales prices to Bottorff.

However, as previously noted, even with these adjustments, the prices to Bottorff were lower than those to Canadian customers by amounts ranging in the six quarters from one to 29 cents per unit. In Spry's opinion, the reason for these remaining price differentials was that (R. 119–20):

> The 47 percent discount previously referred to was granted on shipments of 100 units or more. And when one considers that the shipments to Bottorff were in the approximation of 1,400, 1,300 units per invoice, then the additional allowance for that quantity ordered is certainly, in my opinion, sufficient to absorb the variance of 1 to 29 cents per unit.

When questioned as to the methods employed in preparing exhibit 2, Spry agreed that the overhead expenses did not remain constant from year to year; that Hallman's relocation of part of its manufacturing plant in 1965 from Waterloo to Kitchener, Ontario would have affected some of its operations and it was a "possibility" that it affected some of the percentages used; that no attempt was made to allocate expenses to third country sales (which he stated did not exceed 2,000 jacks during this period); that the unit costs of $1.07 and 14 cents for the Canadian and United States markets constituted an "average unit base" without taking into account that some of the units (four different sizes of jacks, as noted before, are involved) may have had higher costs than others; and that he could have obtained a more accurate estimate of the expense allocations between the two markets for 1965 and 1966 if he had used the actual expenses incurred. However, he observed, "[t]o certify to the correct allocation of expenses in this company would be almost an impossible job" (R. 124).

Spry explained that all overhead expenses were included in calculating the

---

swer this allocation would be determined. It is not a mathematically precise determination, your Honor. It is a reasonable estimate made by management which appeared reasonable to us with our long knowledge of the nature of the business.

17. The differential of 93 cents determined for the 12 months of 1965 was applied to the entire 18-month period ending June 1966 because it was the only information available (R. 142). Of the invoices involved herein, 22 cover merchandise ordered and exported during 1965, and 11 cover merchandise ordered and exported in 1966.

costs incurred in connection with jack sales in each market because (R. 144–5):

[e]very expense that the company has is related to earning its profits. * * * I believe in the final disposition of the jack an expense is a part of the process whether it is selling the jack or whether it is typing the invoice. They are all expenses relative to the business.[18]

## IV

■ Since value determinations made pursuant to the Antidumping Act are presumed by statute to be correct (see section 210 (19 U.S.C. § 169 and 28 U. S.C. § 2635)), plaintiffs must prove that the district director erred in determining the adjusted foreign market values and then establish that they are entitled to the additional allowance claimed under section 202(b) (19 U.S.C. § 161(b)). See e. g., United States v. Fisher Scientific Co., 44 CCPA 122, 124, C.A.D. 648 (1957); Brooks Paper Company v. United States, 40 CCPA 38, 41, C.A.D. 495 (1952); James C. Goff Company v. United States, 58 CCPA 147, C.A.D. 1019, 441 F.2d 671 (1971).

In light of these considerations, the primary question is whether plaintiffs have established (1) that an additional 93 cents should have been allowed in computing foreign market value by reason of other differences in circumstances of sale (section 202(b)(2) (19 U.S.C. § 161(b)(2)); and (2) that the remaining price spread ranging from 1 to 29 cents between the Canadian sales prices (as adjusted by Spry) and Bot-

torff's statutory purchase prices should have been allowed because of the differences in wholesale quantities in which the merchandise was purchased in the Canadian and United States markets (section 202(b)(1) (19 U.S.C. § 161(b)(1)). Plaintiffs also urge that, irrespective of any allowance for differences in circumstances of sale, Bottorff purchased in sufficiently large quantities, as compared to the quantities purchased by Canadian customers, to justify the entire price differential between the two markets.

■ With specific reference to plaintiffs' first claim, namely their entitlement to the allowance, it must be borne in mind that plaintiffs bear a dual burden. First, they must prove the existence of other differences in "circumstances of sale" within the meaning of the statute—and then prove their monetary value. For the reasons that follow, it must be concluded that plaintiffs have failed in their proofs on both counts.

The term "differences in circumstances of sale" was added in 1958 to section 202(b) (19 U.S.C. § 161(b)) by Public Law 85–630 (72 Stat. 583–584), which amended the Antidumping Act of 1921. This was done in order to bring the definition of foreign market value "generally into line with the definition of fair value"[19] as contained in section 14.7(b) of the Customs Regulations, as amended April 8, 1955 (T.D. 53773, p. 96). This section provided in pertinent part:

(1) *Quantities and circumstances of sale.*—In comparing the purchase

---

18. Defendant's witness, Kokos, was of the opinion that (1) Spry should not have thrown all the general administrative and financial expenses into one category; and (2) should not have distributed them on the basis of selling expenses. He stated that use of 1965 and 1966 figures rather than 1964 figures would have provided a more accurate determination of the percentage allocations in 1965 and 1966. As to exhibit 2, he believed that the allocations were arbitrary since they were management estimates which were not supported by detailed evidence or data. He conceded, however, that he himself, on many occasions, had had to make ar-

bitrary adjustments where no other alternative was available. Further, he agreed that the nature of certain expenses as between various customers might differ due to differences in circumstances of sale.

19. See Treasury Department Explanatory Memorandum, Hearings before the Senate Committee on Finance on H.R. 6006 to Amend Certain Provisions of the Antidumping Act of 1921 (85th Cong., 2d Sess., 1958) p. 19 (hereafter referred to as "Senate Hearings"). It is to be noted that the term "fair value" is not defined anywhere in the Antidumping Act.

price or exporter's sales price, as the case may be, with the sales on which a determination of fair value is to be based, a reasonable allowance may be made for any differences in quantities and circumstances of sale.

Both the Senate and House reports accompanying H.R. 6006, subsequently enacted as Public Law 85–630, included the following explanation:[20]

### Differences due to "other circumstances of sale"

Under the bill as reported, provision is made (sec. 202(b)(2) and (c)(2)) for consideration of "other differences in circumstances of sale" in addition to quantity differentials. This is designed to facilitate efficient and fair comparison between foreign market value and price to the United States market. Examples would be differences in terms of sale, credit terms, and advertising and selling costs.

The Treasury Department, which, as previously pointed out (note 19), had submitted an Explanatory Memorandum on H.R. 6006 to the Senate Finance Committee, described this amendment as follows (Senate Hearings, p. 19):

(3) A further change in section 202(b) requires that allowance be made for differences in circumstances of sale in determining foreign market value. An example would be the payment of advertising expenses in the United States by a manufacturer attempting to introduce a product into the United States market, whereas in the home market the advertising expenses are borne by the distributors. Under the present law this would not constitute any basis for the assessment of dumping duties. The amendment would require that the amounts expended by the manufacturer for advertising in connection with his sales to the United States be added to his home market price for the purpose of determining foreign market value; if as a result the foreign market value is

higher than the price to the United States and a finding of dumping has been made, dumping duties would be assessed in an amount equal to the difference. Conversely, if the manufacturer paid advertising costs in the home market but not in the United States, the advertising expenses would be deducted from the home market price in determining foreign market value.

Other circumstances of sale would be selling costs, restrictions affecting value, commissions, differences in inland freight costs, and other items affecting the price of the merchandise in one market as compared with another.

Obviously, the term "differences in circumstances of sale" is not subject to precise definition, and there is no hard and fast rule for determining what such differences will be in a given case. It is clear, however, from the foregoing statements that this amendment was designed and intended to allow an adjustment in calculating foreign market value only for those factors and conditions which have a reasonably direct bearing on, or relationship to, the sales under consideration. Thus, although the cost factors might vary considerably in each case, depending upon the kind of merchandise involved, the sales and marketing practices, and other conditions, all would have one common element—a reasonably direct effect upon the sales under scrutiny.

Therefore, the adjustment allowed under section 202(b)(2) (19 U.S. C. § 161(b)(2)) does not permit, as plaintiffs have done, the indiscriminate lumping together of all overhead expenses such as administrative, general financial management and selling expenses into a stewpot labeled "differences in circumstances of sale." Rather, it must be shown that each claimed expense had a reasonably direct effect upon the sales in the market under consideration.

20. S.Rep.No.1619 (85th Cong., 2d Sess., 1958), 2 U.S.Cong. & Admin.News (1958) p.

3504; H.Rep.No.1261 (85th Cong., 1st Sess., 1957) p. 7.

■ Plaintiffs have manifestly failed to establish such relationship, relying instead upon the unsupported assertion that a portion of all overhead expenses, even administrative and financial, represent costs incurred "in connection with jack sales to Canadian customers that are not applicable to sales to Bottorf [sic]" (exhibit 2, p. 3).[21] Absent a showing that the claimed items have a reasonably direct bearing on sales in the Canadian market not incurred in sales to the United States, no allowance can be made for them under section 202(b)(2) (19 U.S.C. § 161(b)(2)).[22]

However, even if plaintiffs had shown that they were entitled to an allowance for some of these overhead expense items, they have nonetheless failed *in toto* to establish by substantial competent evidence the cost of these items for the period involved, thus foreclosing the court from finding foreign market values other than those found by the district director.

■ The proofs required to establish a value under the Antidumping Act must meet the same standards of competency and substantiality required in all cases involving valuation of merchandise for customs purposes. See section 210 of the Antidumping Act (19 U.S.C. §

169). And on this aspect, a basic concept of all value determinations by the court is that they must be based upon proof of *actual* costs of prices—*not* estimates, approximations or averages. Hamers Company v. United States, 51 Cust.Ct. 407, 413, R.D. 10595 (1963). Thus, use of percentages in calculating expenses or profits will be rejected if they are not based upon *actual amounts* of expenses incurred or profits added. Gerhard & Hey Co., Inc. v. United States, 30 Cust.Ct. 580, 587–588, A.R.D. 13 (1953). Also, evidence of the *average* prices at which merchandise was sold may not be used as a basis for determining its statutory value. United States v. International Graphite & Electrode Corp., 25 CCPA 74, 86–7, T.D. 49066 (1937).

■ Moreover, where a party is attempting to establish the general expenses and profits of one segment of a company's business activities, the evidence offered must bear a direct relationship to the expenses and profits actually derived from that phase of the company's operations and not be based upon an arbitrary apportionment. Judson Sheldon International Corporation v. United States, 51 Cust.Ct. 374, R.D. 10586 (1963), aff'd 54 Cust.Ct. 773, A. R.D. 183 (1965).[23]

21. When questioned as to his reasons for listing all overhead expenses as costs incurred in connection with jack sales, Spry observed (R. 148) that—

> [t]he ultimate end of J. C. Hallman is to sell a product. In that interpretation all expenses can be, I suppose, referred to selling the product.

However, Spry readily conceded that not all of the overhead expenses listed in exhibit 2 are considered selling expenses. R. 131–2. Thus, when preparing the *certified* annual financial statements for 1964 and 1965 for Hallman's shareholders (exhibits A and 5) Spry did not lump together all these overhead expenses as selling expenses; rather he listed them separately under the headings "financial," "general and administrative" and "selling"—which categorizations, he agreed, were made on the basis of general accounting principles. See R. 131. In other words, in preparing a certified report for Hallman's shareholders, Spry used an entirely different

"accounting" method from that which he employed in the present case.

22. Plaintiff's reliance upon James C. Goff Co. v. United States, *supra*, 58 CCPA 147, is misplaced. In that case, appellants had claimed that the appraisers erred in determining the foreign market value of the imported merchandise by failing to make sufficient allowances under section 202(b)(2) for certain expenses incurred in home market sales which allegedly were not present in sales to the United States. The appeals court affirmed the holdings of the trial judge and the Appellate Term of this court that plaintiffs had failed to establish through a competent qualified witness what the claimed costs actually were. At no time did the court reach or consider the question whether these cost items, if proved, were "differences in circumstances of sale" within the meaning of the statute.

23. One of the issues involved in *Judson Sheldon*, in which plaintiff was claiming that the

In Hill Brown Corp. v. United States, 54 CCPA 99, C.A.D. 917 (1967), appellant was engaged in three separate businesses, one of which involved the imported merchandise (decorative linens) for which it was claiming United States value as the proper basis of appraisement. In an attempt to establish the general expenses and profits to be deducted from the domestic price, appellant, which kept no separate records of the expenses and profits of its three businesses, determined the amount of overhead expenses for the linen importations by finding the ratio between the total linen sales and the total sales of all three businesses and applying that percentage to the total overhead expenses for all three operations. Appellant sought to justify this procedure as a "reasonable" way to apportion costs among a company's business operations to obtain "reasonable" allowances for the general expenses of the linen business.

The appeals court in *Hill Brown* rejected this argument and affirmed the Appellate Term's holding that appellant had not proven the general expenses and profits chargeable to the imported merchandise.[24] To the same effect see also National Carloading Corp. v. United States, 60 CCPA 54, C.A.D. 1080, 469 F.2d 1398 (1972).

---

invoice prices of the merchandise represented the correct United States values, was the sufficiency of proof offered by plaintiff to establish the items of profit and general expenses which, under the statute, must be deducted to arrive at net United States values. In this connection, the trial court stated as follows (51 Cust.Ct. at 379) in language cited approvingly by the Appellate Term (54 Cust.Ct. at 777–8) :

　　* 　* 　* 　The court is not satisfied that the evidence as to "profit" and "general expenses" is sufficient to support plaintiff's claimed values. According to the evidence, no separate books were kept by the importer covering the profit and general expense items as applied to the imported merchandise alone. The testimony indicates that the only records kept by the company show entries of sales of all types of merchandise by the company; that, in order to determine the profit and general expenses to be assigned to the involved merchandise, it was necessary to assume that the same amount of profit proportionately was derived from the sale of the films and condensers as was derived from the sales of other merchandise; and that the general expenses relating to the handling of the condensers and films were exactly the same in proportion as the general expenses incurred in handling the other merchandise sold by the importer.

　　* 　* 　* 　Plaintiff attempts to establish the general expenses for the involved merchandise by applying to such merchandise a percentage in relation to the percentage for general expenses covering all sales of merchandise made by plaintiff. This is unsatisfactory proof, since it may well be that it cost more to handle other types of merchandise, or less, as the case

may be, than the outlay incurred for handling the imported merchandise. It is also very probable that the amount or margin of profit differs as applied to the various types of merchandise involved. The court is definitely of the opinion that the evidence offered does not meet the burden resting upon the plaintiff to establish the amount of profit and general expenses properly deductible for the ascertainment of the value of the involved merchandise.

24. The court also cited (54 CCPA at 102–103) the following statement from the Appellate Term's principal opinion (55 Cust.Ct. 771, 776, A.R.D. 198 (1965)) :

　　* 　* 　* 　in computing the general expenses and, hence, profit, to be deducted from the domestic selling price of the merchandise, plaintiff has fallen into error. Its general expenses bear no relationship to the actual expenses incurred in its linen fabrics operations, which is the only phase of its business operations with which the court is concerned. The practice of apportioning operating expenses equally among all phases of a company's business operations, in lieu of the actual operating expenses incurred by a particular phase of business being inquired into, has not met with judicial approval. Judson Sheldon International Corporation v. United States, 51 Cust.Ct. 374, Reap.Dec. 10586, affirmed February 24, 1965, 54 Cust.Ct. 773, A.R.D. 183. Therefore, we agree fully with the trial court that "The record is barren of any evidence to show that in the processing and marketing of the merchandise at bar, operating costs were proportionately the same as the operating costs for conducting the other phases of plaintiff's business, however that proportion might be determined."

The evidentiary requirements spelled out in the foregoing cases for establishing the various statutory values are equally applicable here in establishing the claimed foreign market values for the imported jacks. However, the testimonial and documentary evidence adduced in this case, as previously recounted in detail, falls far short of meeting those standards. In no sense does this evidence reflect the actual expenses incurred by the jack division.[25]

From what has been said, the court must regard as totally without merit plaintiffs' assertion that, by virtue of Customs Regulations section 14.7 defining fair value—which is not here in issue in determining foreign market value—they need only establish their claim under section 202(b)(2) (19 U.S. C. § 161(b)(2)) by "reasonable evidence" (br. p. 27) and that they have sustained their burden by proving a "reasonable amount" (br. p. 23) for differences in circumstances of sale. Hill Brown Corp. v. United States, *supra*, 54 CCPA 99; Kobe Import Co. v. United States, 43 CCPA 136, C.A.D. 620 (1956); Brooks Paper Company v. United States, *supra*, 40 CCPA 38.[26]

It is also noted that plaintiffs rely almost exclusively upon the testimony of Spry and upon exhibit 2, which was prepared by him, although he had no personal knowledge of the claimed overhead expenses and had to rely upon what Hallman management told him. It does not lend credence to plaintiffs' case that the witness Hallman, who supervised all of the company's activities and presumably knew more about its financial affairs than anyone else, was unable to testify as to the basis for allocating the various expenses among his company's production lines other than that they "tried to allocate what our company was doing and what the expense should be allocated to" (R. 62).

---

25. The sole exception is the "Finished goods warehousing" expense which was based upon actual use of inventory space in 1965. Whether these figures also hold true for the first six months in 1966 is not indicated.

26. In this connection, both parties and amicus curiae rely upon the *"fair value"* definition in section 14.7(b) of the Customs Regulations. This section, as approved on April 29, 1960 and published on May 6, 1960 (25 F.R. 3948) as T.D. 55118, sets forth the differences in circumstances of sale for which allowances could be made in the section determining *"fair value."* To the extent relevant here, the section provided as follows in language which remained unchanged through the period in issue (see T.D. 56315, 29 F.R. 16320 (1964)):

(2) *Circumstances of sale.*—In comparing the purchase price or exporter's sales price, as the case may be, with the sales, or other criteria applicable, on which a determination of fair value is to be based, reasonable allowances will be made for bona fide differences in circumstances of sale if it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences.

Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a reasonably direct relationship to the sales which are under consideration. Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties, technical assistance, servicing, and assumption by a seller of a purchaser's advertising or other selling costs. Reasonable allowances will also generally be made for differences in commissions. Except in those instances where it is clearly established that the differences in circumstances of sale bear a reasonably direct relationship to the sales which are under consideration, allowances generally will not be made for differences in research and development costs, production costs, and advertising and other selling costs of a seller unless such costs are attributable to a later sale of merchandise by a purchaser; provided that reasonable allowances for selling expenses generally will be made in cases where a reasonable allowance is made for commissions in one of the markets under consideration and no commission is paid in the other market under consideration, the amount of such allowance being limited to the actual selling expense incurred in the one market or the total amount of the commission allowed in such other market, whichever is less.

\* \* \* \* \*

The court is compelled to conclude that the logistics employed by plaintiffs in constructing what can only be characterized as a bootstrap operation is palpably insufficient to establish their claim to an adjustment of 93 cents, or any other amount, for differences in circumstances of sale.[27]

As mentioned previously, plaintiffs further contend that irrespective of any allowance for differences in circumstances of sale, Bottorff purchased in sufficiently large quantities, as compared to the quantities purchased by Canadian customers, to justify the entire price differential between the two markets. But this contention must also fall. Section 202(b)(1) (19 U.S.C. § 161(b)(1)) provides, as noted before, that a due allowance shall be made in determining foreign market value if it is established—

* * * that the amount of any difference between the purchase price and the foreign market value (or that the fact that the purchase price is the same as the foreign market value) is wholly or partly due to—

(1) the fact that the wholesale quantities, in which * * * [the] merchandise is sold * * * to the United States * * * are * * * greater than the wholesale quantities in which such * * * merchandise is sold * * * in the * * * country of exportation * * *

On this phase, the record discloses that a 47% discount from the Hallman price list was offered to all purchasers of 100 or more units, and that this discount was allowed by the district director in determining the foreign market values. However, there is not a scintilla of evidence in the record (Spry's speculation to the contrary notwithstanding) that Hallman offered additional discounts for purchase of larger quantities

or that the lower prices charged Bottorff were "due to" his volume purchases.

It is also worthy of note on this aspect that plaintiffs relied solely on the conjectures of a witness who was not familiar with the price structure of Hallman's merchandise, whereas the witness Hallman, the company's president, who would be most knowledgeable in this area, was entirely silent on this question. Indeed, upon reflecting on the trial proceedings, it would appear that plaintiffs' counsel carefully refrained from questioning Hallman with respect to his company's discount policy.

V

Section 201(b) of the Antidumping Act (19 U.S.C. § 160(b)) provides that whenever the Secretary of the Treasury has reason to believe, in the case of any imported merchandise, that the purchase price or exporter's sales price is less, or likely to be less, than the foreign market value, he shall—

* * * forthwith publish notice of that fact in the Federal Register and shall authorize, under such regulations as he may prescribe, the withholding of appraisement reports as to such merchandise entered, or withdrawn from warehouse, for consumption, not more than one hundred and twenty days before the question of dumping has been raised by or presented to him * * *.

Plaintiffs contend that sections 14.6(e) and 14.9(a) of the Customs Regulations (19 CFR 14.6(e) and 14.9(a) (1965 ed.)) then in effect (which were promulgated pursuant to section 201(b) (19 U.S.C. § 160(b)) precluded appraising officers from withholding appraisements of the steel jack entries until the publication on September 9, 1965 of the supplementary withholding of appraisement notice advising that purchase price

27. Defendant's brief stresses certain discrepancies between the data contained in the invoices covered by the entries in issue and the figures set out in exhibit 2 relative to

the monthly sales of jacks for the period in question. In view of the court's findings, it is unnecessary to deal with this aspect of plaintiffs' proofs.

was the appropriate basis of comparison for fair value purposes.

These sections of the regulations provide, in pertinent part, as follows:

14.6(e) If the Commissioner determines * * * that there are reasonable grounds to believe or suspect that any merchandise is being, or is likely to be, sold at less than its foreign market value * * * he shall publish notice of that fact in the Federal Register, furnishing an adequate description of the merchandise, the name of each country of exportation, and the date of the receipt of the information in proper form, and *shall advise all appraisers of his action. This notice may be referred to as the "Withholding of Appraisement Notice."* * * * The notice shall * * * specify whether the appropriate basis of comparison for fair value purposes is purchase price or exporter's sales price *if sufficient information is available to so state;* otherwise a supplementary notice will be published in the Federal Register as soon as possible which will specify which of such prices is the appropriate basis of comparison for fair value purposes. Upon receipt of such advice, the appraisers shall proceed to withhold appraisement in accordance with the pertinent provisions of section 14.9. [Emphasis added.]

14.9(a) Upon receipt of advice from the Commissioner of Customs pursuant to section 14.6(e), if the Commissioner's "Withholding of Appraisement Notice" shall specify that the proper basis of comparison for fair value purposes is exporter's sales price *or if that notice does not specify the appropriate basis of comparison for fair value purposes, each appraiser shall withhold appraisement as to such merchandise entered, or withdrawn from warehouse, for consumption, on any date after the 120th day before the question of dumping was raised by or presented to the Secretary of the Treasury or his delegate.* If the Commissioner's "Withholding of Appraisement Notice," including any supplementary notice, shall specify that the proper basis of comparison for fair value purposes is purchase price, the appraiser shall withhold appraisement as to such merchandise entered, or withdrawn from warehouse, for consumption, after the date of publication of the "Withholding of Appraisement Notice." * * * [Emphasis added.]

Construing these sections in *pari materia,* the only reasonable interpretation to be placed upon them is that the appraisers were directed to withhold appraisements upon receipt of the original "Withholding of Appraisement Notice," and that the phrase "Upon receipt of such advice" in section 14.6(e), like the phrase "Upon receipt of advice" in section 14.9(a), refers to the original, not to the supplementary, notice. Any other construction would render superfluous and meaningless the phrases "and shall advise all appraisers of his action" in section 14.6(e) and "or if that notice does not specify the appropriate basis of comparison for fair value purposes" in section 14.9(a).

This interpretation also comports with the provisions contained in sections 201(b) and 202(a) of the Antidumping Act (19 U.S.C. §§ 160(b) and 161(a)), supra.[28]

It is to be added that the question of dumping was presented to the Secretary by means of information received on April 13, 1965. See 31 F.R. 100. This being the case, appraisements could properly be withheld as to merchandise entered after December 13, 1964 (the 120th day before the question was raised). Since all the entries involved

---

28. Whether the provision in section 201(b) (19 U.S.C. § 160(b)) that the Secretary "shall authorize" the withholding of appraisement reports is mandatory or only "permissive," as defendant asserts, is not before the court for consideration. On this point, however, see S.Rep.No.1619, *supra* note 20, at 3501.

here were made after that date, it follows that all the merchandise in question was subject to appraisement for dumping duty purposes.

## VI

Finally, plaintiffs assert that "[t]he failure of the Treasury Department to adjust the foreign market value in accordance with [section 202 (19 U.S.C. 161)] renders his determination of sales at less than fair value invalid" (br. p. 37).

In so arguing, plaintiffs appear to have confused the concept of sales at less than fair value with foreign market value. Section 201 of the Antidumping Act (19 U.S.C. § 160) provides for assessment of dumping duties whenever (a) the Secretary of the Treasury determines that a *class or kind* of foreign merchandise is being, or is likely to be sold, in the United States at a price less than its fair value and (b) the Tariff Commission determines that an industry in the United States is being or is likely to be injured, or is prevented from being established by reason of the importation of such merchandise into this country. (For the purposes of the Act, "fair value," as previously discussed, is defined in section 14.7 of the Customs Regulations (19 CFR 14.7)). Thus, the determinations of the Secretary and the Tariff Commission are concerned with the *class or kind* of merchandise involved, not a particular importation.

■ The dumping duties, however, are measured by the difference between (1) the "purchase price" (or "exporter's sales price") of the particular importation (as defined in sections 203 and 204 (19 U.S.C. §§ 162 and 163)) and (2) the "foreign market value" (as defined in section 205 (19 U.S.C. § 164) with the adjustments provided for in section 202(b) (19 U.S.C. § 161(b)). Accordingly, whether or not the district director erred in determining the foreign market value of any of the importations involved here by not making sufficient allowance for the differences in the usual wholesale quantities or other differences in circumstances of sale under section 202(b) (19 U.S.C. § 161(b)), has no bearing on the Secretary's determination under section 201 (19 U.S.C. § 160) as to sales of the *class or kind* of merchandise at less than fair value and a finding of error in foreign market value can in no wise affect his determination therein.

■ Even more important, it is settled that in enacting the Antidumping Act, Congress delegated to the Secretary broad discretionary authority. And in this respect, the court is limited to determining whether the Secretary or his delegate acted within the scope of his delegated authority and correctly construed the pertinent statutory language. The court may not go further and weigh the evidence or review the conclusions the Secretary drew therefrom. Thus, in Kleberg & Co. (Inc.) v. United States, 21 CCPA 110, 115, T.D. 46446 (1933), our court of appeals stated:

It is equally well established by the authorities that if the Secretary of the Treasury has proceeded in the method prescribed by the Congress, we may not judicially inquire into the correctness of his conclusions. The constitutionality of the law under which he proceeds having been once determined, then the judicial power extends only to a correction of his failure to proceed according to and within the law. United States v. Sears, Roebuck & Co., *supra;* Clarke v. United States, 17 CCPA (Customs) 420, T.D. 43866; United States v. Tower & Sons, 14 Ct.Cust.Appls. 421, T.D. 42058; United States v. Central Vermont Railway Co., 17 CCPA (Customs) 166, T.D. 43474.

This being the state of the law, we are not at liberty here to go into an investigation as to whether the facts shown on the trial below justified the issuance of the order complained of. * * *

See also Imbert Imports, Inc. v. United States, 60 CCPA 123, C.A.D. 1094, 475 F.2d 1189 (1973); City Lumber Co. v. United States, 59 CCPA 89, C.A.D. 1045,

457 F.2d 991 (1972); United States v. Elof Hansson, Inc., 48 CCPA 91, C.A.D. 771, 296 F.2d 779 (1960), cert. den. 368 U.S. 899, 82 S.Ct. 179, 7 L.Ed.2d 95 (1961).

## VII

In summary, plaintiffs have failed to establish (i) that the foreign market values found by the district director for the importations herein are erroneous; (ii) that the merchandise entered prior to September 9, 1965 was not subject to dumping appraisement; or (iii) that the Assistant Secretary of the Treasury erred in finding sales at less than fair value.

Judgment will be entered accordingly.