trict Court for the Southern District of Texas, Galveston Division, Galveston, Texas.

For the foregoing reasons, it is ordered that defendants' motion to dismiss is denied; and this action is *sua sponte* transferred to the United States District Court for the Southern District of Texas, Galveston Division, Galveston, Texas. The Clerk of the United States Court of International Trade is directed to effect the transfer to the District Court.

## CARLISLE TIRE AND RUBBER COMPANY, PLAINTIFF *v.* UNITED STATES, DEFENDANT

Before MALETZ, *Judge.*

Court No. 79-3-00513

(Dated May 12, 1982)

*Eugene L. Stewart* and *Daniel G. Rooney* for the plaintiff.

*J. Paul McGrath,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch (*Sheila N. Ziff* on the brief), for the defendant.

*Lauren R. Howard; Collier, Shannon, Rill & Scott* of counsel; for amicus curiae Bicycle Manufacturers Association of America, Inc.

MALETZ, *Judge:* Plaintiff, a domestic manufacturer of bicycle tires and tubes, has brought this action to contest final determinations on December 29, 1978 by the Secretary of the Treasury under the Antidumping Act of 1921, as amended (19 U.S.C. 160 et seq. (1976 ed.)).[1] The background is this.

In January 1978 plaintiff filed a petition with the Secretary alleging that certain bicycle tires and tubes from Taiwan were being, or were likely to be, sold at less than fair value within the meaning of the Antidumping Act.[2] Following receipt of the petition, the Secretary initiated an investigation which was limited to the four manufacturers in Taiwan that produced approximately 86 percent of the bicycle tires and tubes imported from Taiwan during the investigation period, i.e., Nan Kang Rubber & Industrial Corp. (Nan Kang); Hwa Fong Rubber Industrial Company, Ltd. (Hwa Fong);

---

[1] The determinations were published in 43 Fed. Reg. 61066 (1978). It is to be noted that the Antidumping Act was replaced effective January 1, 1980 by section 101 of the Trade Agreements Act of 1979 (19 U.S.C. 1673 et seq. (1980 Supp.)).

[2] The term "fair value" is not defined in the Antidumping Act but is determined in accordance with the Customs Regulations. Thus, 19 CFR 153.1 (1978) specifies that merchandise imported into the United States will ordinarily be considered to have been sold or to be likely to be sold, at less than fair value if the purchase price or exporter's sales price, as the case may be, is, or is likely to be, less than the price at which such or similar merchandise is sold for consumption in the country of exportation. For a summary of the Antidumping Act and its administration, see *F. W. Myers & Co., Inc.* v. *United States,* 72 Cust. Ct. 219 at 220-1, C.D. 4544, 376 F. Supp. 860 at 862-3 (1974).

Cheng Shin Rubber Industrial Co., Ltd. (Cheng Shin); and Kenda Rubber Tire Corp., Ltd. (Kenda).

In order to determine whether the merchandise in question was being, or was likely to be, sold at less than fair value, the Secretary concluded that the proper basis of comparison, except for Nan Kang, was between purchase price and the adjusted home market price of such or similar merchandise.[3] With respect to Nan Kang, the Secretary concluded that the proper basis of comparison was between purchase price and third country price to Canada of such or similar merchandise because he found that there were inadequate home market sales.

Comparisons were made on approximately 97 percent of the sales of the involved merchandise sold for export to the United States by the four manufacturers during the period of the investigation. On the basis of such comparisons and using the foregoing criteria, no dumping margins were found on sales by Nan Kang. As to sales by Hwa Fong, the Secretary found a weighted average dumping margin of 0.23 percent which was deemed to be de minimis. Based on these findings, the Secretary determined that there were no less than fair value sales of imported bicycle tires and tubes manufactured by either Nan Kang or Hwa Fong.

A weighted average dumping margin of 0.79 percent was found by the Secretary in the case of imported bicycle tires and tubes produced by Cheng Shin and a weighted average dumping margin of 0.5 percent in the case of Kenda. However, the margins thus found on sales by Cheng Shin and Kenda were "considered [by the Secretary] to be *minimal* in relation to total volume of exports." 46 Fed. Reg. at 61067, col. 2. [Emphasis in original.]

A formal assurance that all future sales to the United States would be at prices that were not less than fair value was received from these two firms and was accepted by the Secretary. *Ibid.* In view of the minimal margins and formal assurance, the Secretary discontinued the antidumping investigation of Cheng Shin and Kenda. *Id.* at 61066, col. 2.

Against this background, plaintiff argues that these findings and determinations are erroneous. First it contends that the discontinuance of the antidumping investigation of Cheng Shin and Kenda resulted from the application of an improper standard. It further contends that in computing the foreign market value, the Secretary improperly allowed deductions from home market prices for inland freight and for other claimed differences in the circumstances of sales in the home market as compared to sales in the market for export to the United States.

According to plaintiff, were purchase prices and foreign market values properly computed, the margins of less than fair value sales

---

[3] "Purchase price" as defined in section 203 of the Antidumping Act (19 U.S.C. 162) is the price paid by the importer to the exporter with certain specified adjustments and is utilized as the basis of comparison with home market price if the importer and exporter are dealing at arm's length.

by each of the four Taiwanese producers would be neither de minimis nor minimal. Thus plaintiff insists that the Secretary should have affirmatively determined that the imported bicycle tires and tubes were being sold at less than fair value by Nan Kang, Hwa Fong, Cheng Shin and Kenda.

I

As noted before, the Secretary discontinued the antidumping investigation of Cheng Shin and Kenda based in part upon his determination that the less than fair value dumping margins (0.79 percent and 0.5 percent, respectively) were considered minimal in relation to the total volume of each firm's exports. We consider now plaintiff's argument that the discontinuance was grounded upon the application of an improper standard.

The conditions under which an antidumping investigation may be discontinued are set out in a Customs Regulation, 19 CFR 153.33 (1978), which provides in part:

> (a) *Price assurances, termination of sales or other circumstances.* Whenever the Secretary is satisfied during the course of an antidumping investigation that:
>> (1) The possible margins of dumping involved are minimal in relation to the volume of exports of the merchandise in question, price revisions have been made which eliminate any likelihood of present sales at less than fair value, and assurances have been received which eliminate any likelihood of sales at less than fair value in the future;
>> * * *
>
> *    *    *    *    *    *    *
>
>> (3) * * * the Secretary may publish a "Notice of Tentative Discontinuance of Antidumping Investigation" in the Federal Register.
>
> *    *    *    *    *    *    *
>
> (d) *Final discontinuance.* Within three months after publication of a "Notice of Tentative Discontinuance of Antidumping Investigation", the Secretary will determine whether final discontinuance is warranted and, if he determines that it is warranted, publish a "Notice of Discontinuance of Antidumping Investigation" in the Federal Register.

While the validity of this regulation is not challenged, the parties disagree as to its interpretation. Thus, defendant argues that the regulation directs the Secretary to evaluate dumping margins in the context of a company's aggregate world-wide exports, while plaintiff contends that such margins must be evaluated only in the context of a company's volume of exports to the United States. It is true that the regulation does not expressly state that it is limited to exports to the United States. However, that limitation appears apparent. The regulation is directed to price revisions and assurances of the elimination of less than fair value sales in the future.

Since the Secretary is not charged with responsibility for stopping dumping around the world, the provision is manifestly aimed at preventing dumping of merchandise exported and sold to the United States.

The focus of the Antidumping Act is on merchandise imported into the United States. Necessarily, the Secretary had to look to exports to the United States since less than fair value margins were determined with respect to merchandise shipped to the United States. Therefore, a company's exports to countries other than the United States are irrelevant except of course in instances where exports to third countries could serve as the measure of fair value, as they did here in the case of Nan Kang's sales to Canada.

Because irrelevant, it is not known whether and to what extent export sales by Cheng Shin and Kenda to countries other than the United States were at less than fair value. Thus, a consideration of each firm's total world-wide volume of exports told nothing about the extent or magnitude of dumping in the United States. Moreover, evaluating in relation to total export sales to countries other than the United States, the margins of dumping associated with goods sold to the United States diminished the significance of each firm's less than fair value sales to the United States market—the only market with which the Antidumping Act was concerned.

In short, to the extent the Secretary took into consideration in his discontinuance determination Cheng Shin's and Kenda's total world-wide export sales rather than their total export sales to the United States, his determination is erroneous.

Aside from this, defendant states that the Secretary's calculations of Cheng Shin's and Kenda's dumping margins are erroneous to some extent. Given that situation, defendant points out that there is no way of knowing, until the proper calculations are made and the correct dumping margins determined, whether the margins may still be considered minimal under the regulation. Accordingly, defendant requests that the matter be remanded to the Secretary of Commerce, who is now the administering authority,[4] for recalculation of the deductions and adjustments in order to ascertain the actual dumping margins and to determine whether the investigation was properly discontinued. Defendant's request is granted and the Secretary's determination with respect to Cheng Shin and Kenda is vacated. The matter is remanded to the Secretary of Commerce for a redetermination not inconsistent with this opinion. The Secretary is directed to report his redetermination to the court within 90 days of this order.

---

[4] Responsibility for administration of the Antidumping Act was transferred to the Secretary of Commerce pursuant to Reorg. Plan No. 3 of 1979, § 5(a)(1)(C), 44 Fed. Reg. 69275, 93 Stat. 1381, eff. Jan. 2, 1980, as provided by section 1-107(a) of Ex. Ord. No. 12188, January 2, 1980, 45 Fed. Reg. 993.

## II

In computing the foreign market value of bicycle tires and tubes manufactured in Taiwan, the Secretary reduced home market prices by the amount of inland freight costs to buyers in Taiwan. Plaintiff contends that allowance of such adjustments is contrary to the statutory definition of foreign market value. But this same argument was made in *Brother Industries, Ltd., et al.* v. *United States,* 3 CIT 125, Slip Op. 82–34 (Apr. 30, 1982), and, in a comprehensive and well-reasoned opinion by Judge Newman, found to be without merit. Slip Op. at 35–39. For the reasons set out in *Brother,* I likewise conclude that the reductions for inland freight "were properly granted in determining the foreign market value as differences in circumstances of sale." *Id.* at 36.

## III

Plaintiff next argues that the Secretary erred in allowing reductions of home market prices because no "causal connection" was established between the differences in circumstances of sale and the differential between purchase prices and home market prices. Thus, plaintiff states that while the record contains information about the costs and expenses associated with the differences in circumstances of sale, it does not contain information about the market value of such different circumstances of sale and hence failed to establish the necessary causal link between the differences in circumstances of sale and price differentials. Continuing, plaintiff observes—correctly—that in establishing this necessary causal connection, the Secretary relied on the costs of such differences in conformity with a Customs Regulation, 19 CFR 153.10(c) (1978), which provides in part:

> In determining the amount of the reasonable allowances for any differences in circumstances of sale, the Secretary will be guided primarily by the cost of such differences to the seller but, where appropriate, may also consider the effect of such differences upon the market value of the merchandise.

Plaintiff argues strenuously that the regulation violates the letter and spirit of the Antidumping Act since it favors costing data over pricing information. Again, this identical argument was made in *Brother;* treated exhaustively; and found lacking in merit. Slip Op. at 7–25. Suffice it to say that I deem *Brother* controlling on this issue.

## IV

Under 19 C.F.R. 153.10(a) (1978) allowances for differences in circumstances of sale "are limited, in general, to those circumstances which bear a direct relationship to the sales under consideration." Subsection (b) of this regulation provides that "[e]xamples of differences in circumstances of sale for which reasonable allowances gen-

erally will be made are those involving differences in credit terms * * * [and] warranties * * * " 5

At issue here, given this regulation, are whether the allowances made by the Secretary for certain home market warranties and credit terms are proper. On the one hand, plaintiff argues that home market warranties and credit terms are subject to the direct relationship standard, while defendant argues that the Secretary has discretion either to apply the direct relationship standard or to attribute their costs to a later sale. The court agrees with plaintiff that since home market warranties and credit terms are specifically identified as falling within the ambit of the direct relationship standard, it is impermissible to attribute their costs to later sales. As to which standard the Secretary followed is not clear from the record. Therefore, this matter too is remanded to the Secretary of Commerce for appropriate findings and a redetermination if necessary. The Secretary is directed to report his findings and a redetermination, if made, within 90 days of this order.

For the foregoing reasons, the cross-motions for summary judgment are denied.

---

5 The regulation contains an exception from the direct relationship standard for "advertising and other selling costs." Thus section 153.10(b) provides that "allowances generally will not be made for differences in advertising and other selling costs of a seller unless such costs are attributable to a later sale of merchandise by a purchaser."