ORDERED, ADJUDGED, and DECREED: that the subject merchandise is properly classified under item 706.41, TSUS, and plaintiff's claim is hereby dismissed.

SILVER REED AMERICA, INC. and Silver Seiko, Ltd., Plaintiffs,

Brother International Corp. and Brother Industries, Ltd., Plaintiff–Intervenors,

v.

UNITED STATES of America, Defendant,

Consumer Products Division, SCM Corporation, Defendant–Intervenor.

CONSUMER PRODUCTS DIVISION, SCM CORPORATION, Plaintiff,

v.

UNITED STATES of America, Defendant,

Silver Reed America, Inc., Silver Seiko, Ltd., Brother International Corp., Brother Industries, Ltd., and Nakajima All Co., Ltd., Defendant–Intervenors.

Court No. 83–10–01522.

United States Court of International Trade.

Jan. 12, 1988.

Willkie Farr & Gallagher (Christopher A. Dunn, William J. Clinton, Kenneth J. Pierce, Zygmunt Jablonski, Washington, D.C., of counsel), for Silver Reed America, Inc. and Silver Seiko, Ltd.

Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Washington, D.C., John M. Breen, of counsel), Robert E. Walton, Gen. Counsel, for SCM Corp.

Tanaka, Ritger & Middleton, Washington, D.C., for Brother Industries, Ltd. and Brother Intern. Corp.

Ben L. Irvin and John B. Rehm, Washington, D.C., for Nakajima All Co., Ltd.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, D.C. (Velta A. Melnbrencis, Atty.), New York City, Deborah A. Persico, Attorney–Adviser, Office of the Deputy Chief Counsel for Import Admin., U.S. Dept. of Commerce, for U.S.

## MEMORANDUM OPINION AND ORDER

NEWMAN, Senior Judge:

### Introduction

Silver Reed America, Inc. ("Silver Reed") and Silver Seiko, Ltd. ("Silver Seiko") (collectively "Silver") have moved in this consolidated action for judgment on the agency record pursuant to USCIT Rule 56.1 respecting *Portable Electric Typewriters from Japan; Final Results of Administrative Review of Antidumping Order*, 48 Fed.Reg. 40761 (September 9, 1983). Silver contends that certain determinations made by the United States Department of Commerce, International Trade Administration ("Commerce" or "ITA"), in its Final Results of the first administrative review of the antidumping order on portable electric typewriters ("PETs") from Japan are unsupported by substantial evidence on the record and are otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B) (1982).

Specifically, Silver challenges the following determinations made by ITA in its administrative review:

(1) ITA's deductions of imputed credit or interest expenses from Silver's exporter's sales prices ("ESP");

(2) ITA's deductions of imputed currency exchange rate losses from Silver's ESP;

(3) ITA's disallowance of Silver's claim for an adjustment to foreign market value for differences in quantities of merchandise

produced for sale in the United States market and in Japan; and

(4) ITA's disallowance of Silver's claim for a level-of-trade adjustment to foreign market value.

Accordingly, Silver seeks reversal in part of the Final Results of the administrative review and remand to ITA for further proceedings. For the reasons set forth below, ITA's Final Results are reversed in part, and this action is remanded for further proceedings and recalculation of the dumping margins for Silver's PETs consistent with this opinion and order.

## Background

On September 9, 1983 Commerce published the Final Results of its administrative review under section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675, covering PETs exported from Japan by Brother Industries, Nakajima All Co., Ltd. and Silver Seiko for varying periods during 1980 and 1981. 48 Fed.Reg. 40761. In adjusting the prices in the two markets for comparison purposes, Commerce deducted from the Silver's ESP various imputed selling expenses and exchange rate losses. Commerce also rejected Silver's claims for adjustments: (1) predicated on differences in quantities of PETs produced for sale in the United States and in Japan; and (2) predicated upon sales at different levels of trade in the United States and in Japan. 48 Fed.Reg. 40763–4.

## Issues Presented

1. Whether ITA properly deducted from Silver's ESP imputed, rather than actual, presale inventory carrying costs or expenses related to selling Silver's PETs in the United States;

2. Whether ITA properly deducted imputed currency exchange rate losses from ESP;

3. Whether ITA properly rejected Silver's claim for a quantity discount adjustment in determining the foreign market value of Silver's PETs;

4. Whether ITA properly rejected Silver's claim for a level-of-trade adjustment in determining the foreign market value of Silver's PETs.

## Discussion

### I

The Court of Appeals for the Federal Circuit has held that "the statute [Trade Agreements Act of 1979] reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." *Smith Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). *See also ICC Industries, Inc. v. United States*, 812 F.2d 694, 699 (Fed.Cir.1987) ("[a]n agency's interpretation of a statute which it is authorized to administer is 'to be sustained unless unreasonable and plainly inconsistent with the statute, and [is] to be held valid unless weighty reasons require otherwise'" (quoting from *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 928 (Fed.Cir.1984). Similarly, in *ICC Industries, Inc.*, *id.* at 699, the court commented that "[a]n agency's 'interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable'" (quoting from *Consumers Products Div., SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033, 1039 (Fed.Cir.1985) (emphasis in original)). This court has also stressed that "[t]he deference granted or extended to the agency's interpretation of its statutory mandate also applies to the methodology that the agency employs in fulfilling its lawfully delegated mission." *Ceramica Regiomontana, S.A. v. United States*, 636 F.Supp. 961, 965–966 (CIT 1986), *aff'd*, 810 F.2d 1137 (Fed.Cir.1987). In that regard, this court went on to say (*Id.* at 966):

In order for the ITA effectively to administer the countervailing duty laws, it is necessary to permit some methodological flexibility. As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not im-

pose its own views as to the sufficiency of the agency's investigation or question the agency's methodology. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984); *Abbott v. Donovan*, 6 CIT 92, 570 F.Supp. 41, 46–47 (1983).

Observing the foregoing principles concerning judicial review of agency action in antidumping cases as well as the statutory standard of review in such cases (*see* 19 U.S.C. § 1516a(b)(1)(B) (1982)), this court concludes that, except for several matters discussed *infra* concerning which ITA has erred, ITA's statutory interpretation and methodology employed in the Final Results challenged in this case are reasonable and in accordance with law, and its determinations are supported by substantial evidence in the administrative record.

## II

During the period covered by the first administrative review, Silver Seiko manufactured and transferred PETs to its wholly-owned United States subsidiary, Silver Reed, and the latter resold them from inventory to its United States customers. Silver Reed then transferred payment for the merchandise to Silver Seiko when Silver Seiko's payment terms expired. In adjusting the prices in the two markets for comparison purposes ITA did not limit its deductions from ESP to those based on actual cash outlays reported by the companies, but also deducted certain imputed selling costs or expenses calculated according to certain formula as if they were interest or credit expenses.

Silver does not object to the deduction from ESP of an imputed direct credit expense for the time between Silver Reed's resale of the PETs in the United States and Silver Reed's receipt of funds from the unrelated United States customer. Silver's memo at 12–13.[1] However, Silver challenges:

(1) the imputation of indirect selling expenses consisting of pre-sale inventory carrying costs for the interval of time between the date of shipment of merchandise from Japan to the United States and resale by Silver Reed to unrelated United States customers;

(2) the double-counting of actual interest expenses for inventory financing in addition to an imputed inventory financing expense for the time period the merchandise was in Silver Reed's inventory; and

(3) the deduction of an imputed direct credit expense for the time period between Silver Reed's receipt of funds from the unrelated United States customer and its repatriation of those sales proceeds to Silver Seiko.

Section 772(e)(2) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677a(e)(2), provides:

(e) **Additional adjustments to exporter's sales price.**—For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—

\* \* \* \* \* \*

(2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise, \* \* \*

ITA interprets the foregoing statutory provision as referring to both direct and indirect selling expenses related to United States sales, and in the challenged Final Results ITA deducted from ESP both direct and indirect imputed selling expenses:

The Department considers the calculated expense between the time Silver Seiko ships the merchandise to the United States and the time Silver Reed sells it to an unrelated U.S. customer as an indirect selling expense to be deducted from exporter's sales price. The Department considers the time between Silver Reed's sale and Silver Reed's repayment of Silver Seiko to be a direct selling expense. For both types of expense, the Department imputed values. These are expenses that would have been incurred in

---

1. Indeed, Silver acknowledges that such deduction is an appropriate part of the adjustment for differences in circumstances of sale. Silver's Memo. at 27.

the U.S. but for Silver Seiko's action. It is therefore proper under the Tariff Act to impute such a cost and deduct it in calculated ESP.

48 Fed.Reg. at 40765, A.R. 7549.

■ As noted *supra*, Silver disputes ITA's deduction of imputed indirect selling expenses consisting of pre-sale inventory carrying costs which were calculated from the date of shipment of the PETs from Japan to the United States until the date when Silver Reed resold the PETs to an unrelated United States customer. 48 Fed. Reg. 49765. Commerce interprets the language in section 1677a(e)(2), "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise," as covering direct and indirect selling expenses related to United States sales regardless of the geographic location of incurrence of the expense. Silver admits that under the statute selling expenses incurred for United States sales are deductible from ESP regardless of the party that incurred the expense—including the exporter in a foreign country. Silver's reply memo at 12. Nonetheless, Silver urges that to be deductible from ESP, the selling expenses themselves must be actually incurred "in the United States." The plain language of the statute supports Silver's contention, and therefore ITA erroneously deducted from ESP an imputed interest expense for the period between shipment of the merchandise from Japan and the entry of that merchandise in the United States. Obviously, the imputed financing cost for "time on the water" before importation is not an expense incurred "in the United States" under the statute.

The court turns to Silver's contention that ITA's interpretation of section 1677a(e)(2) as permitting the deduction of imputed selling expenses from ESP violates the statute since it permits the deduction only of actual cash outlays and not fictional "expenses that could have been incurred" or "expenses whether or not actually incurred." Silver's Memo. at 30–31. On that score, Silver urges that ITA's action is contrary to generally accepted accounting principles (which do not impute interest costs for holding merchandise), the language of the statute (which limits deductions from United States Price to "expenses generally incurred") and the rule enunciated in *F.W. Myers v. United States*, 72 Cust.Ct. 219, 376 F.Supp. 860 (1974), that "all" value determinations under the antidumping law must be based on "actual amounts of expenses incurred." Continuing, Silver alleges that ITA's position relative to imputed interest has been inconsistent.

■ In essence, Silver maintains that the most reasonable interpretation of the statutory language, "expenses generally incurred," is that only actual cash outlays incurred in selling the merchandise as reported in the company accounting records should be deducted. Silver's Memo at 31. Defendant, however, argues against Silver's restrictive interpretation pointing out that since in the statute the word "generally" qualifies the word "incurred," Congress intended that expenses that are generally or usually incurred by or for the account of the exporter in the United States must be deducted from ESP, regardless of whether the expenses are actually carried on the company's books. The court finds that ITA's construction of the statute as authorizing deduction of imputed selling expenses is reasonable under certain circumstances and effectively implements the intent of Congress in section 1677a(e)(2).

Silver's reliance upon such cases as *F.W. Myers & Co. v. United States*, 72 Cust.Ct. 219, 376 F.Supp. 860 (1974), and *Brother Industries, Ltd. v. United States*, 3 CIT 125, 540 F.Supp. 1341 (1982), *aff'd sub nom. Smith–Corona Group v. United States*, 713 F.2d 1568 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984), is misplaced. As aptly pointed up by defendant, those cases did not involve deductions from ESP in conformance with section 1677a(e)(2), but rather involved adjustments to foreign market value for differences in circumstances of sale pursuant to section 1677b(a). Given the incentive of exporters to minimize dumping margins, this court is not per-

suaded that adjustments to foreign market value (which adjustments exporters have every incentive to maximize) are analogous to deductions from ESP (which deductions exporters have an incentive to minimize).

While defendant concedes that ITA's present practice of deducting imputed costs from ESP is inconsistent with its former practice of deducting only actual cash outlays, the court is advised that ITA now regularly follows the practice of deducting from ESP all expenses related to selling the merchandise in the United States whether or not the expenses are reflected in the exporter's books.[2] Defendant's Memo at 19–20.

■ Finally, Silver argues that Commerce improperly deducted a direct expense for the time between Silver Reed's receipt of sales proceeds from its United States customers and the "repatriation" of those funds to Silver Seiko. It appears that in connection with all sales, Silver Reed transferred funds to Silver Seiko after Silver Reed's resale of the PETs to unrelated United States customers but prior to receipt of the funds from those customers. ITA, therefore, properly deducted an imputed direct credit expense for the period between resale of the PETs by Silver Reed to its United States customers and receipt of funds by Silver Reed. However, Commerce concededly should not have, and did not, deduct a credit expense for the "transfer of funds" period. Defendant's memo at 8. In any event, if in fact such deduction was made, as alleged by Silver, ITA is directed to correct that error on remand.

Respecting the "double-counting" issue raised by Silver, Commerce acknowledges that it erred in its deduction of imputed expenses for six invoices. Commerce requests a remand "in order to reprogram the data, examine the calculations made for imputed direct and indirect selling expenses and to correct the errors previously made." Defendant's memo at 7. Accordingly, ITA is directed to review the record and correct any errors in double-counting of selling expenses arising from imputation of such expenses.

III

Silver challenges ITA's adjustment of ESP predicated upon certain currency exchange rate "losses" recorded in Silver's books. In this connection, Silver contends that the exchange rate loss adjustment was improper because no variation actually occurred in the dollar value of the PETs. Hence, argues Silver, exchange losses are irrelevant when the price-to-price comparison is made in United States dollars and the United States sales are denominated in dollars. Silver further maintains that ITA's imputation of exchange rate losses in a price-to-price comparison involving dollar-denominated United States sales constitutes an unjustified departure from ITA's long-standing practice.

■ Defendant concedes that, under the circumstances presented here, it has not been the practice of ITA to make an adjustment for currency exchange rate gains and losses, and that Commerce should not have deducted the exchange rate losses as an indirect expense from the United States Price. Inasmuch as defendant admits that ITA erred in deducting imputed currency exchange rate losses from ESP, this error must be corrected upon remand, as requested by defendant.

IV

The court now addresses Silver's claim that ITA improperly disallowed an adjustment in determining the foreign market value of Silver's PETs for the difference in the quantity of PETs sold in Japan and in the United States. Before ITA, Silver sought to establish a cost justification for the claimed adjustment of foreign market value in compliance with 19 C.F.R. § 353.14(b)(2). Silver argued before Commerce that the foreign market value for its

---

2. *See, e.g., Color Televisions from Korea, Final Results of Administrative Review of Antidumping Duty Order,* 49 Fed.Reg. 50420, 50427, 50430 (Dec. 28, 1984); *Television Receiving Sets, Monochrome and Color, from Japan; Final Results of Administrative Review of Antidumping Finding,* 50 Fed.Reg. 24278 (June 10, 1985).

PETs should be adjusted for differences in the quantity produced for sales in the United States and in Japan based on cost savings which it experienced in producing for the United States market.

Silver's Comments:

Comment 19: The Department erroneously denied Silver Seiko's claim for an adjustment for differences in the quantities produced for sales in the U.S. and Japan. Since home market production runs are much smaller than U.S. production runs, Silver Seiko contends that the per-unit amount of fixed expenses, specifically labor expenses, is much higher on home market sales. Silver Seiko disagrees with the Department's reason for denying the claim, i.e. that the cost adjustments proposed by Silver Seiko were based on Silver Seiko's special time studies and were not substantiated by Silver Seiko's customary labor cost accounting procedure, the Management Time Method. Silver Seiko argues that the Management Time Method is not applicable to the tasks involved in setting up the production runs because they are unlike the simple and repetitive tasks reliably measured by the Management Time Method. Further, in previous determinations in this case, the Department denied this claim not because its record keeping was inadequate, but because the expense related to overhead costs. Silver Seiko argues that this type of reversal of policy decisions applies the antidumping law as a trap for the unwary, rather than encourages an exporter to make fair pricing decisions.

48 Fed.Reg. at 40764.

Commerce rejected Silver's contention, stating:

Department's Position: The Department acknowledges that Silver Seiko sells in smaller quantities in its home market than it does to the United States. However, when we verified the expense, we found that Silver Seiko does not produce for specific orders in the home market but instead produces machines which are then placed in the warehouse. Therefore, we regard these increased per-unit expenses as general overhead costs, as we have done in the past. In denying the claim, we did not rely on inadequate record keeping.

48 Fed.Reg. at 40764.

An adjustment for quantity discounts in determining foreign market value is authorized by 19 U.S.C. 1677b(a)(4)(A), which provides so far as pertinent:

(4) Other adjustments.—In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to—

(A) the fact that the wholesale quantities, in which such or similar merchandise is sold or, in the absence of sales, offered for sale, for exportation to, or in the principal markets of, the United States, as appropriate, in the ordinary course of trade, are less or are greater than the wholesale quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale, in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold for home consumption, then for exportation to countries other than the United States);

\*　　\*　　\*　　\*　　\*　　\*

then due allowance shall be made therefor.

In 1980, Commerce promulgated regulations which implemented 19 U.S.C. § 1677b(a)(4)(A). The regulations provided in relevant part:

(a) In general. In comparing the United States price with such applicable criteria as sales or offers, on which a determination of foreign market value is to be based, comparisons normally will be made on sales of comparable quantities of the merchandise under consideration. Further, reasonable allowances will be made for differences in quantities to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences in the quanti-

ties sold. In determining allowances for differences in quantity, consideration will be given, among other things, to the practice of the industry in the country of exportation with respect to affording in the home market ... discounts for quantity sales which are available to those who purchase in the ordinary course of trade.

(b) Criteria for allowances. Allowances for price discounts based on quantitative differences in sales ordinarily will not be made unless:

(1) Six month rule. The exporter during the period covered by the antidumping investigation as established under § 353.38 (or during such other period as investigation shows is more representative) had been granting quantity discounts of at least the same magnitude with respect to 20 percent or more of such or similar merchandise sold in the home market ... in the ordinary course of trade; or

(2) Cost justification. The exporter can demonstrate that the discounts are warranted on the basis of savings which are specifically attributable to the production of the different quantities involved.

19 C.F.R. § 353.14(a) and (b).

Relying on subsection (b)(2) of the foregoing regulation, Silver claims that the foreign market value of its PETs should have been adjusted by ITA to offset the lower United States prices specifically attributable to cost efficiencies in high volume production for the United States market. Defendant readily acknowledges Silver has demonstrated that higher per unit costs were associated with the production of PETs for the home market, but urges that Silver "failed to show a link between the differences in cost and the basis for the claimed adjustment, in this case quantity." Deft. Memo at 24.

■ From section 1677b(a)(4) and 19 CFR § 353.14(a), it is clear the party claiming a quantity discount allowance must establish to the agency's satisfaction that any price differential is due to the fact the wholesale quantities in which the merchan-dise is sold for exportation to the United States is lesser or greater than the wholesale quantities in which the merchandise is sold in the home market.

Defendant maintains that Silver failed to link the differences in price between its smaller quantity sales in the home market and larger quantity sales in the United States with the difference in the cost of producing different quantities for the two markets. According to defendant, inasmuch as home market PETs were not produced for specific orders, but rather for inventory, Silver simply chose to produce fewer PETs *per production run* for the home market regardless of the quantity sold. Defendant further stresses that ITA will not as a matter of methodology grant a quantity discount adjustment based solely upon cost savings from differences in production runs for products sold in the home market and in the United States.

■ The court sees no error concerning ITA's approach to the quantity discount adjustment claimed by Silver in requiring a showing of a link between the differences in cost and the basis for the claimed adjustment. The evidence submitted by Silver in support of its claim that it costs less to produce PETs for sale in the United States merely suggests that it was Silver's choice to produce fewer PETs per production run in the home market, irrespective of the quantities sold. Consequently, the court holds that Commerce reasonably treated the admittedly higher unit costs for the PETs produced for home market sales as general overhead expenses, and properly denied Silver's claim for an adjustment to foreign market value for the difference in the quantities produced for sales in Japan and in the United States.

V

Silver complains of ITA's refusal to grant a level-of-trade adjustment for Silver's home market prices. Commerce's regulation 19 C.F.R. § 353.19 provides:

The comparison of the United States price with the applicable price in the home market of the country of exporta-

tion ... generally will be made at the same commercial level of trade. However, if it is found that the sales of the merchandise to the United States or in the applicable foreign market at the same commercial level of trade are insufficient in number to permit an adequate comparison, the comparison will be made at the nearest comparable level of trade and appropriate adjustments will be made for differences affecting price comparability.

During the administrative review, Silver claimed it was entitled to a level-of-trade adjustment due to the fact that it sold only to retailers in the home market and only to wholesalers in the United States and that there were differences in selling costs in the two markets:

Comment 20: The Department erroneously denied Silver Seiko's claim for an adjustment for differences in level of trade. In its home market, Silver Seiko sells only to retailers, using three market channels, while on certain sales to the U.S. it sells to Olivetti, a wholesaler. Section 353.19 of the Commerce Regulations permits an adjustment for actual differences in level of trade, to the extent it can be established that the differences in level of trade produce differences in cost. Silver Seiko submits that it has established a reasonable basis for quantifying the differences in cost due to level of trade through its separation of corporate divisions, with one for large Japanese retailers, one for small Japanese retailers, and one for Olivetti.

48 Fed.Reg. at 40764.

Commerce rejected Silver's claim, stating:

Department's Position: The Department maintains that Silver Seiko did not adequately demonstrate that the difference in cost between the two markets is due to a difference in level of trade. Moreover, in the final affirmative determination in this case (45 FR 18416–18, March 21, 1980), we stated that "[s]ince the price comparison was made in both markets using sales to customers who bought in large wholesale quantities, no adjustment for differences in level of trade is warranted."

48 Fed.Reg. at 40764–40765.

ITA's position that Silver did not adequately demonstrate that the difference in cost between the two markets was due to the difference in the level of trade was not explained in ITA's Final Results. Defendant now contends that a company must establish its claim for a level-of-trade adjustment by showing that within the *home market,* where all other facts are equal, sales at different levels of trade incur different costs. Deft.Memo at 28. According to defendant, the foregoing approach establishes that the difference in price between United States sales and home market sales is due to a difference in the levels of trade rather than simply to differences resulting from disparate market conditions in two distinct markets. However, as noted above, defendant's rationale here was not articulated by Commerce in its Final Results.

Silver also challenges Commerce's denial of the level-of-trade adjustment predicated on the second reason contained in Commerce's comment relating to Silver's claim for the level-of-trade adjustment. Thus, Silver contends that Commerce denied the level-of-trade adjustment in the administrative review for the erroneous reason for which Commerce previously denied the level-of-trade adjustment in the less-than-fair-value determination that was the subject of *Silver Reed America, Inc. v. United States,* 7 CIT 23, 581 F.Supp. 1290 (1984), *rev'd on other grounds sub nom. Consumer Products Division, SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033 (Fed.Cir.1985). The court agrees with Silver's contention that the second reason stated by ITA for denying the level-of-trade adjustment was rejected in *Silver Reed, supra.*

On remand, Commerce is directed to fully explain its position that Silver did not adequately demonstrate that the difference in cost between the two markets is due to the difference in level of trade, and to specifically disclose wherein Silver failed in its proof in this matter. Moreover, on re-

mand Commerce shall not predicate its determination regarding Silver's claim for a level-of-trade adjustment upon the second reason stated by Commerce in its Final Results. *See Silver Reed,* 7 CIT at 30–32, 581 F.Supp. 1295–1296.

### Conclusion

As we have seen, ITA erroneously deducted from the ESP for Silver's PETs imputed exchange rate losses and erroneously "double-counted" certain expenses respecting Silver's PETs. The court finds that ITA also erred in imputing an interest expense for the period between shipment of the merchandise from Japan and the entry of that merchandise in the United States, *viz.,* "time on the water." ITA is further directed to ascertain whether a credit expense was erroneously imputed for the "transfer of funds period," and if so, correct such error. Finally, ITA shall reconsider Silver's claim for a level-of-trade adjustment and advise the court fully of its reasons for rejection of the evidence Silver submitted on that matter.

ITA's Final Results in all other respects are sustained since they are supported by substantial evidence in the administrative record and are otherwise in accordance with law.

ORDERED that the Final Results of Commerce in its first administrative review of the antidumping order respecting PETs from Japan is reversed in part, and this case is remanded to Commerce for additional proceedings consistent with this opinion. ITA shall report to this court the results of remand within 90 days from the date of this order.