RAUTARUUKKI OY, PLAINTIFF *v.* UNITED STATES, DEFENDANT

Consolidated Court No. 93–09–00560–AD

(Decided March 31, 1995)

*Ackerson & Bishop, Chartered (Frederick P. Waite, M. Roy Goldberg* and *Stewart Block)* for Rautaruukki Oy.

*Skadden, Arps, Slate, Meagher & Flom (Robert E. Lighthizer, John J. Mangan, Mark C. Del Bianco, Ellen Schneider* and *Pranav Trivedi)* and *Dewey Ballantine (Alan Wm. Wolff* and *Michael H. Stein)* for Inland Steel Industries, Inc., Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel, Inc. of Alabama, Lukens Steel Company, Sharon Steel Corporation and U.S. Steel Group a Unit of USX Corporation.

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, and *Velta A. Melnbrencis,* Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; and Office of the Chief Counsel for Import Administration, U.S. Department of Commerce *(Robert J. Heilferty),* of counsel, for the defendant.

## MEMORANDUM AND ORDER

AQUILINO, *Judge:* This action consolidates CIT No. 93–09–00560 commenced by Rautaruukki Oy and CIT No. 93–08–00608 brought by Inland Steel Industries, Inc., Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel, Inc. of Alabama, Lukens Steel Company, Sharon Steel Corporation and U.S. Steel Group, a Unit of USX Corporation. These firms have all interposed motions for judgment on the record compiled by the International Trade Administration, U.S. Department of Commerce ("ITA") *sub nom. Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate From Finland,* 58 Fed.Reg. 37,122 (July 9, 1993), *amended,* 58 Fed.Reg. 44,165 (Aug. 19, 1993).

Jurisdiction of this court is based on 28 U.S.C. §1581(c), with the standard of judicial review of the issues raised whether the challenged agency determination is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. §1516a(b)(1)(B).

## I

Rautaruukki Oy's motion, which will be referred to hereinafter as that of the "plaintiff", seeks judgment based upon errors sought to be

attributed to the ITA, including (a) refusal to make a "small item quantity" adjustment to foreign-market value pursuant to 19 U.S.C. §1677b(a)(4)(A); (b) refusal to consider corrected information regarding heat treatment of certain carbon steel plate products for the calculation of the margin of dumping; (c) disallowal of a circumstances-of-sale adjustment pursuant to 19 U.S.C. §1677b(a)(4)(B) for direct selling expenses; and (d) rejection of revised information as to general and administrative expenses used in calculating the foreign-market value.

## A

In regard to the first specification of error, the plaintiff defines "item quantity" as "one size and one quality of carbon steel plate (or other flat-rolled carbon steel product) in one customer order for a single delivery to a single destination at a single time." Plaintiff's Motion, p. 10. The statute governing the ITA on this issue states:

> In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value * * * is wholly or partly due to—

> > (A) the fact that the commercial quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale, for exportation to, or in the principal markets of, the United States, as appropriate, in the ordinary course of trade, are less or are greater than the commercial quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale, in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold for home consumption, then for exportation to countries other than the United States);

> > *　　*　　*　　*　　*　　*　　*

> then due allowance shall be made therefor.

19 U.S.C. §1677b(a)(4). *See also* 19 C.F.R. §353.55. And the agency's final determination states that plaintiff's

> support on the record for this claim consists merely of a single chart, lacking comprehensive, narrative explanation, and a figure reported in the sales listing field for this claimed adjustment. In its response to the Department's sales questionnaire, Rautaruukki claimed to be working on a "study" to justify the adjustment. However, no such study was ever placed on the record in this investigation. The information which Rautaruukki has presented does not adequately support or quantify the claim for a quantity adjustment.

58 Fed.Reg. at 37,123.

The plaintiff disputes this characterization, claiming three submissions in the record contain "more than adequate support for making a small item quantity adjustment to * * * FMV." Plaintiff's Motion, p. 11. It refers to its response to the agency questionnaire which explained that the "average item size produced by Rautaruukki for the U.S. mar-

ket is \* \* \* larger than for the Finnish home market."[1] Furthermore, the plaintiff asserts that that response specifically included the weighted average effect of the small-item quantity and explained that the "production of the larger number of items for the Finnish home market required more work, more production changes, and more production time", which are considered when pricing the merchandise. *Id.* at 12.

According to the plaintiff, it also provided a chart showing the "relationship of the production costs of carbon steel plate to item quantity" and a memorandum "which analyzed in detail the production costs of carbon steel plate as a function of the item quantity factor." *Id. See* ConfApp Tabs B & C.

On July 1, 1993, the plaintiff requested the ITA to correct the final determination "to reflect the presence of this memorandum on the record \* \* \* and withdraw the final determination until it ha[d] an opportunity to review the memorandum and incorporate this information into a final determination". ConfApp Tab D, pp. 2–3. The agency refused this request:

> \* \* \* The memorandum which Rautaruukki cites was considered in our final determination. However, our final determination was accurate in stating that Rautaruukki's support for its chart and claimed figure was not comprehensive because: 1) the memorandum itself contains the admission that it used a "simplified model" based on an *uncompleted* production cost project; and 2) the memorandum further stated that the project would be completed before the end of the year (1992), but no completed study was ever placed on the record \* \* \* despite several additional opportunities for respondent to do so, including a specific request by the Department for additional support for the claimed adjustment. Therefore, we disagree with Rautaruukki that any ministerial error has been committed.[2]

The court's role now is to "ascertain whether there was a rational basis in fact for the determination." *American Lamb Co. v. United States,* 785 F.2d 994, 1004 (Fed.Cir. 1986), quoting S.Rep. 249, 96th Cong., 1st Sess. 252. A review of the record at bar reveals such a basis. While both the original response to the agency questionnaire and the memorandum sought to be relied upon explain the differing item quantities in the Finnish and the U.S. markets, only the latter attempts to analyze costs of production in any detail. The memorandum explicitly notes, however, that it describes a simplified model because the "complete model to calculate the costs is still unfinished" and that "only the preliminary results are available but before the end of the year the project will be

---

[1] Plaintiff's Motion, p. 11, quoting its confidential appendix ("ConfApp"), Tab A at B–14 to B–15.

[2] ConfApp Tab E, Attached Memorandum, p. 2 (emphasis in original).

At oral argument, the plaintiff opined that this "belated" explanation is insufficient. It seeks a remand for an "official" explanation why the referenced study was rejected. Counsel for the plaintiff acknowledged that this request is a "formality" but nevertheless an important issue for the court to address. Tr. at 7–8. The plaintiff further contended that it was premature at this juncture in the proceedings to consider merits of the study itself. *Id.* at 12.

completed to comprise calculations covering the whole production process." ConfApp Tab C, p. 1. The ITA record is bereft of such a project.[3]

Both the statute and its implementing regulations clearly provide that a party claiming a quantity adjustment must establish "to the satisfaction of the administering agency" that any price differential is due to the fact that the wholesale quantities in which the merchandise is sold for exportation to the United States are lesser or greater than such quantities are sold in the home market. *See, e.g., Silver Reed America, Inc. v. United States*, 12 CIT 39, 47–48, 679 F.Supp. 12, 19 (1988). This court cannot hold unreasonable the agency's conclusion that its preliminary results for the plaintiff, which were essentially an estimate based on the simplified model, were insufficient to support the claim for a small-item quantity adjustment.[4] That is, the court concludes that the ITA's refusal to make that kind of adjustment to foreign-market value was in accordance with law and is supported by the record at hand.

B

The plaintiff complains that the agency disregarded information submitted after the sales verification on March 8–11, 1993 in Raahe, Finland to correct inaccuracies discovered during that process. According to the plaintiff, "as a result of inadvertent clerical errors by company personnel, Rautaruukki failed to record certain internal codes for heat treatment in its initial response to the ITA's questionnaire." Plaintiff's Motion, p. 16. The agency requested that the plaintiff identify the U.S. sales which were mismatched due to heat-treatment misreporting. It did so on April 21, 1993. *See* ConfApp Tabs F, G & H. In its final determination, however, the ITA rejected the submission as "untimely and unsolicited new information". 58 Fed.Reg. at 37,124. Claiming the "errors were systematic in nature", the agency used as best information otherwise available

> the higher of: (1) The highest non-aberrant transaction margin calculated for the firm from among the sales of the same class or kind of merchandise where we were able to calculate a margin, or (2) the average petition rate for the same class or kind of merchandise.

*Id.*

Section 1677e of Title 19, U.S.C. requires resort to the best information otherwise available whenever the ITA "is unable to verify the accuracy of the information submitted" or a party "refuses or is unable to produce information requested in a timely manner and in the form required." *See also* 19 C.F.R. § 353.37.

Of course, the agency may set and enforce its own deadlines, and a party has an obligation to meet them, or obtain extensions thereof. *See*

---

[3] Counsel for the plaintiff explained at oral argument that, although Rautaruukki never advised the ITA, the referenced study was complete and never amended. Tr. at 5.

[4] Although preferable, such a conclusion need not be in the final determination. Furthermore, judicial review is of the entire administrative record, which obviously encompasses more than that determination. Here, that record includes the ITA memorandum refusing plaintiff's request to "correct" the final determination and which contains the agency's explanation for rejecting the preliminary study.

19 C.F.R. §353.31 (1993). However, "[p]rior to resorting to best information available, the Department as a matter of practice often * * * permits a respondent to correct a deficiency *during* the verification process, depending on the nature and scope of the deficiency."[5] Neither the statute nor the regulations provide similarly for information submitted after verification, as in the instant case, regardless of its nature and scope. *Cf. Brother Industries, Ltd. v. United States,* 15 CIT 332, 341, 771 F.Supp. 374, 384 (1991) (corrected information voluntarily submitted to supplement a questionnaire response prior to the preliminary determination in an administrative review relates to a matter already part of the record and therefore is not "new" information). Clearly, in view of the timing, plaintiff's information could not have been verified in accordance with 19 U.S.C. §1677e(b). The ITA's resort to the best information otherwise available was therefore in accordance with law.

## C

The plaintiff contends that the agency improperly disallowed its claim for adjustment of foreign-market value pursuant to section 1677b(a)(4)(B), which provides therefor if "it is established to the satisfaction of the administering authority that * * * any difference between the United States price and the foreign market value * * * is wholly or partly due to * * * other differences in circumstances of sale." The implementing regulations at 19 C.F.R. § 353.56 elaborate:

> (a) *In general.* (1) In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the account of any price differential is wholly or partly due to such difference. In general, the Secretary will limit allowances to those circumstances which bear a direct relationship to the sales compared.
> (2) Differences in circumstances of sale for which the Secretary will make reasonable allowances normally are those involving differences in * * * technical assistance * * *. The Secretary will also make reasonable allowances for differences in selling costs (such as advertising) incurred by the producer or reseller but normally only to the extent that such costs are assumed by the producer or reseller on behalf of the purchaser from that producer or reseller.

It is clear that the burden rested upon the plaintiff to demonstrate a direct relationship between its advertising and technical expenses and the sales during the period of investigation. *See, e.g., Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 64, 592 F.Supp. 1318, 1333 (1984); *Brother Industries, Ltd. v. United States,* 3 CIT 125, 540 F.Supp. 1341 (1982), *aff'd sub nom. Smith-Corona Group v. United States,* 713 F.2d 1568 (Fed. Cir. 1983), *cert. denied,* 465 U.S. 1022 (1984). According to the plaintiff, it satisfied this burden by providing the agency with documentation supporting its claim as to direct selling expenses in the home mar-

[5] *International Trade Administration Revisions to 19 C.F.R.* Part 353, 54 Fed.Reg. 12,742, 12,766 (March 28, 1989) *(Sec. 353.37)* (emphasis added).

ket, including advertising, sales promotion and technical services costs. *See* Plaintiff's Motion, pp. 20–29. In its verification report, however, the ITA asserted that plaintiff's questionnaire responses were only partially examined because "Rautaruukki was not fully prepared to demonstrate that its claimed direct expenses were truly direct in nature, * * * or that it had fully and properly included all relevant costs in its charges and adjustments." ConfApp Tab L, p. 15. More specifically, regarding advertising expenses the agency concluded that it was "unable to perform any test to confirm that the expenses listed were indeed direct advertising expenses or to check that all relevant expenses had been included in Rautaruukki's claimed adjustments." *Id.* Concerning plaintiff's claim for technical services, the ITA explained that

> Rautaruukki presented documentation * * * at verification to demonstrate its direct technical services claim. In our discussions with company officials, it became apparent, and company officials concurred, that the Department's definitions of "direct" and "indirect" expenses were the opposite of Rautaruukki's definitions of these terms. As such, the majority of "direct" technical services expenses which we began to examine appeared actually to be indirect in nature. At that point, we stopped our examination of technical services * * *.

*Id.* In its final determination, the ITA reiterated that it had been "unable to verify that any of the expenses in question were of the nature claimed by respondent" and therefore "treated all of Rautaruukki's claimed U.S. selling expenses as direct and all of Rautaruukki's claimed H[ome] M[arket] selling expenses as indirect." 58 Fed.Reg. at 37,123.

Allegedly, the agency's failure to verify certain information

> was not caused by Rautaruukki's inability to provide the ITA with the documentation at verification. The Department conducted only a partial review of this information and discontinued its verification without a complete and thorough examination of direct and indirect selling expenses. * * * Any unexamined areas were not the result of Rautaruukki's lack of preparedness or inability to present verifiable documentation, but rather the ITA's inability to note those deficiencies while conducting the verification.

Plaintiff's Motion, p. 27.

This contention, however, is not supported by the record. With regard to technical expenses, the ITA explained that examination was terminated only after it became apparent to both the agency and plaintiff's representatives that Rautaruukki Oy's understanding of "direct" and "indirect" expenses was contrary to ITA definitions of these terms. *See* ConfApp Tab L, p. 15. Similarly, the court is unpersuaded that the agency improperly disallowed a circumstances-of-sale adjustment for plaintiff's claimed advertising expenses. As indicated in the verification report, it appears that plaintiff's lack of preparation caused the inability to verify the information submitted. In the absence of any further convincing explanation now on plaintiff's part, this court concludes the

ITA's approach to technical and advertising expenses is supported on the record and otherwise in accordance with law.

### D

The plaintiff contends that the agency erred in calculating foreign-market value by refusing to accept information regarding plaintiff's general and administrative ("G&A") expenses. Correspondence between the ITA and the plaintiff before verification demonstrates that the latter received clear guidance on the manner in which to calculate such expenses, to wit:

> G&A expenses are those expenses which relate to the activities of the company as a whole rather than to the production process. These would include expenses which are not identified with a particular operation * * *. Factory administrative costs, however, are considered to be part of factory overhead. G&A expenses should be allocated on an annual basis based on cost of sales. Provide a worksheet reconciling the G&A expenses reflected on the consolidated financial statements to the amount of G&A expenses used for your calculation. Present the actual calculation reflecting the percentage which you used for the submission.

Defendant's ConfApp Exhibit 6, p. 2. Moreover, the plaintiff was notified when its response to the questionnaire was deemed deficient. *See id.*, Exhibit 9. Despite plaintiff's assertion that it provided ample support for its claim, the agency concluded in the verification report that the plaintiff

> does not report general and administrative expenses specifically as part of its financial reporting. For the verification the company claimed that it derived the G&A costs for the P[eriod of investigation] from the company's records which included fixed factory overhead plus depreciation for non production departments minus the selling expenses. A more specific list of the cost elements included in G&A w[as] not provided. Therefore, it was not possible to determine the accounts or amounts the company had classified as G&A or to verify that the corporate overhead was included as part of G&A. Rautaruukki did not derive a single G&A rate to be applied to the C[osts of manufacturing]. It allocated the total calculated G&A to the various products it produces on the basis of each products *[sic]* share of the total cost of production.

ConfApp Tab M, p. 3. After reiterating this conclusion in its final determination, the ITA, "making an adverse assumption, * * * used higher G&A figures based on data from Rautaruukki's original cost of production submission." 58 Fed.Reg. at 37,124.

On its part, the plaintiff submits that verification exhibit 31, ConfApp Tab N[6], contains the information sought by the agency, namely, a report entitled "Factory's Indirect Costs, Depreciations and Interest of Fixed Assets", which "identifies and quantifies each of the components in-

---

[6] This exhibit was missing from plaintiff's confidential appendix and submitted to the court after oral argument.

volved in G&A expenses, as well as the cost of depreciation and interest on fixed assets." Plaintiff's Reply Brief, p. 14. Moreover, the plaintiff argues that verification exhibit 38, ConfApp Tab 0, "contains a table which shows the method by which [it] calculated its G&A expenses in response to the ITA's questionnaires." *Id.* Continuing, this exhibit

> contains the calculation of cost of sales as well as cost of production. If the ITA wanted to allocate Rautaruukki's G&A expenses on the basis of cost of sales, it had merely to substitute the cost of sales figure for the cost of production figure supplied

by the plaintiff. *Id.*

Perusal of the exhibits on which the plaintiff relies confronts the court with the same problem that faced the ITA. While the report's title, quoted above, appears to provide the specific cost elements involved, it does so only for the month of June. As a result, the court is unable to tie the numbers provided in the report to the "Cost of Fixed Factory Overhead" for the period of investigation. Thus, as the agency noted in its verification report, it is not possible to verify the amounts reported. On this ground alone, the court must affirm the agency's determination.

## II

The motion for judgment on the agency record of Inland Steel Industries, Inc. *et al.* ("Petitioners' Motion") contends that the methodology used by the ITA to adjust United States price ("USP") pursuant to 19 U.S.C. §1677a(d)(1)(C) to account for the Finnish "turn-over" or value-added tax ("VAT") forgiven by reason of export is contrary to both the plain meaning of the statute and recent case law. That section of Title 19 states that the purchase price and the exporter's sales price shall be adjusted by being increased by

> the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.

*See also* 19 C.F.R. § 353.41. Inland *et al.* argue that the agency ignored this "clear statutory mandate, and * * * increase[d] USP by the amount of tax that was actually assessed on comparison home market merchandise" rather than "calculating what the hypothetical tax would have been on the U.S. sale by multiplying the foreign market tax rate by the appropriate U.S. price and * * * increasing USP by the resulting amount." Petitioners' Motion, pp. 10, 15.

The defendant admits that petitioners' preferred methodology was indeed the one used by the ITA in the preliminary investigations.[7] The agency explained in the final determination, however, its rationale for altering the methodology as follows:

> * * * On March 19, 1993, the United States Court of Appeals for the Federal Circuit, in affirming the decision of the Court of International Trade in *Zenith Electronics Corporation v. United States,* * * * ruled that section 772(d)(1)(C) of the Tariff Act provides for an addition to U.S. price to account for taxes which the exporting country would have assessed on the merchandise had it been sold in the home market * * *. Accordingly * * *, the Department has changed its methodology for foreign taxes from that used in the preliminary determinations * * *. [W]e have not calculated a hypothetical tax on the U.S. product, but have added to the U.S. price the absolute amount of tax on the comparison merchandise sold in the country of exportation.[8]

In the *Zenith* case referred to, which is reported at 988 F.2d 1573 (Fed.Cir. 1993), the court addressed, among other things, whether the ITA had improperly made circumstances-of-sale adjustment to foreign-market value. In concluding that the agency was in error and that section 1677a(d)(1)(C) directs the ITA to adjust only the USP, the court noted that this

> statute by its express terms allows adjustment of USP in the *amount* of taxes on the merchandise sold in the country of exportation * * * [and that] Commerce may eliminate the multiplier effect by adjusting USP by the amount, instead of the rate, of the *ad valorem* tax.

988 F.2d at 1582 n. 4 (emphasis in original).

It is this footnote upon which the agency relied in the final determination at bar. However, the defendant now concedes that two recent decisions of this Court of International Trade have not taken that approach, namely, *Federal-Mogul Corp. v. United States,* 17 CIT 1093, 834 F.Supp. 1391 (1993), *appeal Nos. 94–1097, 94–1104 argued Aug. 5, 1994* (Fed.Cir.), and *Avesta Sheffield, Inc. v. United States,* 17 CIT 1212, 838 F.Supp. 608 (1993). Hence, the

> Department has changed its methodology * * *. From now on, the Department will add to USP the result of multiplying the foreign market tax rate by the price of the United States merchandise at the same point in the chain of commerce that the foreign market tax was applied to foreign market sales.

Defendant's Response Brief, p. 58, citing *Final Determination of Sales at Less Than Fair Value: Ferrosilicon From Brazil,* 59 Fed. Reg. 732, 733

---

[7] *See Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products From Argentina,* 58 Fed.Reg. 7,066, 7,069 (Feb. 4, 1993).

[8] *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products From Argentina, Appendix II, Issues Common to all Antidumping Investigations of Flat-Rolled Steel Products.* 58 Fed.Reg. 37,077, 37,078 (July 9, 1993).

(Jan. 6, 1994). *See also The Torrington Company v. United States,* 18 CIT 468, 470–71, 853 F. Supp. 446 at 448–49 (1994), affirming ITA determination on remand to apply the "new" methodology to conform with the *Federal-Mogul* decision. In sum, the agency is in agreement with the petitioners and now seeks a remand for "recalculation of the adjustment to USP for taxes forgiven upon exportation of the plate to the United States." Defendant's Response Brief, p. 60.

In contrast, the plaintiff contends that the methodology applied in the final determination was consistent with the statutory purpose of section 1677a(d)(1)(C), to wit:

> * * * The *Zenith* decision makes it clear that there are a number of permissible means of making the adjustment for VAT, and the Department clearly adopted at the time of the *Final Determination* a method that was not only consistent with the statutory purpose, but which followed the method suggested in footnote 4 of *Zenith*. The fact that a later court, and even the Department itself, may subsequently suggest that there are other methods does not make the method chosen by the Department in the *Final Determination* arbitrary, capricious, or not in accordance with law. It should be affirmed as an acceptable means of making the VAT adjustment.

Opposition of Rautaruukki Oy to Domestic Steel Producers' Motion, p. 4. Moreover, the plaintiff relies on the parallel argument in the Memorandum of Points and Authorities of Hoogovens Groep BV and N.V.W. (U.S.A.), page 31 that the court in *Zenith*

> recognized that the achievement of tax neutrality is a *permissible* goal under the statute, if the Department so elects, provided that it is effected in a manner authorized by the statute. * * * [T]he Court articulated in footnote 4 of its decision a method by which the Department could make the adjustment that both conforms to the statute and achieves tax neutrality * * *.[9]

And the plaintiff points to *Hyster Corporation v. United States,* 18 CIT 119, 848 F.Supp. 178 (1994), adopting the contention that the court "agreed that the statute authorizes the methodology suggested in footnote 4 by the *Zenith* court".[10]

In *Federal-Mogul Corp. v. United States, supra,* the court concluded, however, that that footnote "is clearly at odds with the body of *Zenith* and the language of the statute and is *dicta*"[11], referring to the Federal Circuit's pronouncement that "title 19 explicitly requires Commerce to increase USP by the amount of tax that the exporting country *would have assessed on the merchandise if it had been sold in the home market.*" 834 F.Supp. at 1396, quoting 988 F.2d at 1580 (emphasis added). Relying on the emphasized language, the court held it "clear from this statement, as well as the language of the statute itself, that the sale price

---

[9] Emphasis in original. *Cf. Nat'l Steel Corp. v. United States,* 18 CIT 1126, 870 F.Supp. 1130 (1994).

[10] Memorandum of Points and Authorities of Hoogovens Groep BV and N.V.W. (U.S.A.), p. 32. The court notes in passing, however, that subsequent to issuance of the *Hyster* opinion, the ITA opted in that proceeding for the methodology now pressed by Inland *et al.* herein.

[11] 834 F.Supp. at 1396.

to which the VAT rate is to be applied is the USP". *Id.* The court relied on the analysis in *Daewoo Electronics Co. v. Int'l Union of Electronic, Electrical, Technical, Salaried and Machine Workers, AFL-CIO*, 6 F.3d 1511 (Fed.Cir. 1993), *cert. denied*, 114 S.Ct. 2672 (1994), in which the plaintiffs had challenged the ITA's methodology for calculating the imputed commodity tax base for tax-adjustment purposes. The court of appeals explained that, while section 1677a(d)(1)(C)

> mandates a calculation of imputed tax amounts to be added to the USP, [it] does not specify to which USP the Korean taxes are to be applied as the product moves to the consumer. This determination is important because the Korean taxes are not a specific amount, but instead ad valorem in nature * * *. The Korean taxes must be applied to sales of goods at some discrete moment in the stream of commerce with or in the United States, a different market from that in which the taxes should be levied, but are not, because of exportation.

6 F.3d at 1519 (footnote omitted). The opinion in *Federal-Mogul* noted that *Daewoo* concluded that the ITA's methodology of "determining where in the stream of commerce the Korean authorities applied the *ad valorem* tax rate in the home market and applying the same tax rate to USP calculated at the same point in the chain of commerce and adding this amount to USP" was based on substantial evidence, thereby implicitly recognizing that the *ad valorem rate,* not the *amount* of tax actually assessed in the home market, must be applied to the USP. 834 F.Supp. at 1397. The court therefore ordered the ITA to apply the Japanese VAT rate to USP and add the resulting amount to that price.

In *Avesta Sheffield, Inc. v. United States*, 17 CIT at 1219, 838 F.Supp. at 615, the court agreed that "footnote 4 of *Zenith* does indeed appear to be *dicta*". While the court disagreed that the key sentence in the body of the *Zenith* opinion conflicted with the agency's methodology, it concluded that *Federal-Mogul's* construction was consistent with the statutory language:

> * * * [T]he underlined language does not address whether ITA is permitted to use the actual amount of taxes paid, perhaps because that issue was not before the Court of Appeals. Under the ITA's new approach, U.S. price would be increased "by the amount of tax that the exporting country would have assessed on the merchandise if it had been sold in the home market," at *home market* prices. The approach approved in *Federal-Mogul* would require a U.S. price adjustment by percentage of U.S. price, which treats the merchandise as "if it had been sold in the home market," at its actual price. Thus, neither approach conflicts directly with the key sentence in the body of *Zenith. Federal-Mogul's* construction is, however, in agreement with the wording of 19 U.S.C. §1677a(d)(1)(C). The court has difficulty finding such agreement in ITA's construction.

838 F.Supp. at 614 (emphasis in original, footnote omitted). The court expressed its concern that the

> ITA may not be considering this matter carefully enough in light of *Federal-Mogul* and has chosen a tortured reading of the statute, which puts the court in the awkward position of rejecting a clear statement of the Court of Appeals or a well-reasoned opinion of this court that applies plain statutory language. \* \* \* ITA is directed to reconsider this issue and \* \* \* advise the court \* \* \* whether it is acquiescing or whether it is appealing the *Federal-Mogul* line of cases.

*Id.* at 615. On remand, the ITA adhered to *Federal-Mogul*[12], as it has in subsequent cases. *See, e.g., The Torrington Company v. United States,* 18 CIT 1012, 866 F. Supp. 1434 (1994); *United Electrical Workers of America v. United States,* 18 CIT 1177, Slip Op. 94–199 (Dec. 28, 1994); *The Timken Company v. United States,* 19 CIT 272, Slip Op. 95–20 (Feb. 10, 1995); *Independent Radionic Workers of America v. United States,* 19 CIT 375, Slip Op. 95–45 (March 15, 1995); *Zenith Electronics Corp. v. United States,* 19 CIT 377, Slip Op. 95–46 (March 15, 1995); *Samsung Electronics Co. v. United States,* 19 CIT 384, Slip Op. 95–48 (March 16, 1995).

### III

As indicated above, *Federal-Mogul* is on appeal, and plaintiff's counsel, understandably, have suggested that the court consider holding any relief on Petitioner's Motion in abeyance pending the outcome of that appeal. However, the analysis articulated in *Federal-Mogul* and followed in the cases cited is persuasive. This court therefore remands to the ITA to recalculate the margin of dumping, based upon multiplication of the Finnish VAT rate by USP and increasing that price by the resulting amount. The agency may have 60 days from the date hereof to make and report such determination.

Furthermore, in view of the discussion in Point I of this memorandum, the motion of Rautaruukki Oy for judgment on the agency record must be, and it hereby is, denied in its entirety.

---

[12] *See Redetermination on Remand, Final Determination of Sales at Less Than Fair Value, Certain Welded Stainless Steel Pipe From the Republic of Korea (A–580–810),* Dep't of Commerce (May 2, 1994).